NOT RECOMMENDED FOR PUBLICATION
File Name: 12a0343n.06

No. 10-5831

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED

*Mar 29, 2012*

LEONARD GREEN, Clerk

MICHAEL JONES,

    Plaintiff-Appellant,

v.

CITY OF FRANKLIN,

    Defendant-Appellee.

)
)
)
)
)
)
)
)
)
)
)
)

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF TENNESSEE

OPINION

Before: **GILMAN, ROGERS, and STRANCH, Circuit Judges.**

**RONALD LEE GILMAN, Circuit Judge.** Michael Jones is an African-American firefighter currently employed by the City of Franklin, Tennessee. In November 2008, Jones brought suit against the City, claiming that it had violated his civil rights by (1) treating several white firefighters more favorably than himself, (2) retaliating against him for engaging in protected activity, and (3) failing to eliminate a racially hostile work environment. The district court granted summary judgment in favor of the City on all claims. For the reasons set forth below, we **AFFIRM** the judgment of the district court.

## I. BACKGROUND

This is the second time that Jones has filed a federal lawsuit against the City of Franklin. His first lawsuit, filed in August 2006, raised most of the same claims that he raises here—namely, allegations of disparate treatment based on race and of the City's failure to eliminate a hostile work

environment. That case was dismissed with prejudice on January 23, 2008, when the district court granted the City's motion for summary judgment as to all claims. *See Jones v. City of Franklin* (*Jones I*), No. 3:06-cv-00807 (M.D. Tenn. Jan. 23, 2008) (unpublished opinion). The district court's judgment was affirmed on appeal. *See Jones v. City of Franklin*, 309 F. App'x 938 (6th Cir. 2009).

Less than three weeks after the district court dismissed his 2006 lawsuit, Jones filed a complaint with the Equal Employment Opportunity Commission (EEOC), again alleging discriminatory behavior by the City. Although the EEOC complaint does not appear in the record, it presumably includes the factual allegations and legal claims that form the basis of this lawsuit. Those factual allegations are as follows:

On October 3, 2006, Jones injured one of his arms while responding to a fire. The injury, which was later diagnosed as a torn bicep, was severe enough to prevent him from being able to fulfill his firefighting duties as a lieutenant, the position that he held at the time of the injury. As a result, Jones was placed on light duty, meaning that he would perform administrative functions, transport equipment and supplies to other fire stations in the area, teach elementary schoolchildren about fire safety, and conduct fire inspections of buildings throughout the City. His supervisors hoped that these assignments would provide Jones with enough work until he recovered from his injury, at which point he could return to his regular firefighter duties.

But Jones's recovery was slower than expected. He underwent surgery on his torn bicep on December 5, 2006, and afterward stayed home on doctor's orders for more than six weeks. And when his doctor allowed him to return to work on January 19, 2007, Jones was limited to the same light-duty assignments that he had performed immediately prior to his surgery.

Then, on July 25, 2007—over six months after returning to work and nearly ten months after sustaining his injury —Jones's doctor informed him that his physical limitations were most likely permanent. This development put the City in the position of having to either create a permanent light-duty position for Jones or notify him that he would have to apply for other jobs with the City (or elsewhere) for which he was qualified. It chose to do the latter.

Jones applied for other jobs with the City, but he was not selected for any of the positions to which he applied. Instead, these positions—which included two fire-inspector positions and two positions outside the Fire Department—were all filled by white men. One of these men, Wayne Mobley, had been on light duty from November 2005 to July 2006, at which time he was returned to full duty.

Having failed to secure another position, Jones met with several City officials to discuss his options. At the meeting, Jones expressed a strong interest in returning to his previous duties as a firefighter. He was just two years away from retirement eligibility and wanted to finish his career in his old position. But, as before, the same obstacle to this possibility remained: his doctor's assessment that he was unable to perform the full range of physical tasks required of a full-duty firefighter. To get around this obstacle, Jones proposed retaking the physical-agility test that he had previously passed. The City allowed him to do so, Jones passed the test, and he resumed his responsibilities as a full-duty firefighter on September 19, 2007. He is still in this position today.

Several months later, the Fire Department held a round of diversity-training classes at a local City building. The date of the classes was January 31, 2008—barely one week after the dismissal of Jones's first lawsuit against the City—and Jones was one of the attendees. During a bathroom break, Jones and two other firefighters, Adam Vernon and Kirk White, noticed that the letters "KKK" had

been etched into the wall on the side of one of the urinals. The letters were apparently six to eight inches high and faint from a distance, but clearly visible up close.

Upon seeing the letters, White remarked that it was "a damn shame" that someone would carve such bigotry into the wall of a public restroom. Jones echoed this sentiment. For him, the letters brought to mind a time from his childhood when he and his father had seen the KKK march through a public square in Franklin. Jones suddenly felt quite uncomfortable, but returned to the diversity-training class without reporting the incident.

City policy, however, requires supervisors (a category that includes lieutenants) to report racially offensive incidents up the chain of command. According to this policy, Jones should have reported the KKK incident to his supervisor. He never did so, however, claiming that he was afraid of what might happen to him if he did. Instead, he filed a complaint with the EEOC on February 11, 2008 and included the KKK incident in the complaint.

In contrast to Jones's failure to report, Vernon and White—the two others who had seen the KKK carving—promptly reported the incident to their supervisor, Captain Clay Mackey. But news of the incident stopped with Mackey who, like Jones, failed to report the incident up the chain of command. This meant that the carving was not immediately removed from the restroom wall. Mackey was eventually reminded of the incident, and he reported it to the appropriate Fire Department personnel on March 19, 2008. The carving was removed shortly thereafter, almost two months after Jones, Vernon, and White had spotted it.

As a result of Jones's and Mackey's failure to immediately report the KKK incident to their supervisors, both were suspended for a single 24-hour shift and placed on probation for one year.

Mackey accepted his punishment without appeal. Jones, however, appealed the discipline to a neutral arbitrator. His appeal was unsuccessful.

In addition to the above events, Jones points to several other incidents that he claims bear on his case. He first asserts that, in late 2006, Assistant Chief Gentry Fox failed to report racially offensive conduct up the chain of command—in that case, a subordinate firefighter's complaints of racial discrimination—but that Fox was disciplined more leniently for this misconduct than Jones was for failing to report the KKK incident in 2008. Whereas Jones was suspended for a day without pay and placed on probation for a year, Fox received only a letter of counseling.

Second, Jones claims that he received two emails from supervisor Joe Polenzani on February 25, 2008 that contained racially derogatory references to blacks. The two emails are not in the record, but Jones asserted in his deposition testimony that the emails—which were sent to all Fire Department employees following another round of diversity training—included a link to a website that he found offensive. As described by Jones, the website "tells you all about what happened to African-Americans about lynching and all of that."

Third, Jones's complaint repeats almost word for word many of the same factual allegations that he included in his first lawsuit against the City. The allegations are intended to support his hostile-work-environment claim and consist of the following racially derogatory remarks made by white firefighters:

> "African American employees are referred to as 'niggers' and 'boys'";
>
> "'Blacks' are lazy because they are always missing work on Monday";
>
> "'Pimp days,' when referring to a day an African American misses work";
>
> "Klu [sic] Klux Klan membership cards"; and

"'That's what you get for marrying a nigger,' when referring to the [Caucasian] wife of a firefighter who was having marital problems."

Finally, Jones learned in 2009 that the City was giving leadership training to certain employees of the Fire Department, but that he was not invited. He was told that he was not invited because he had already attended similar training sessions. Jones, however, claims that several of the white firefighters who had already received similar training were invited.

In November 2008, Jones filed suit against the City, claiming that it had violated his civil rights under 42 U.S.C. § 1981; Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*; and the Tennessee Human Rights Act (THRA), Tenn. Code Ann. § 4-21-101 *et seq.* The City moved for summary judgment on all claims. After consideration, the district court granted the City's motion in June 2010 and dismissed the case. This appeal followed.

## II. ANALYSIS

### A.      Standard of review

"We review the district court's grant of summary judgment de novo.*" Bryson v. Middlefield Volunteer Fire Dep't, Inc.*, 656 F.3d 348, 351 (6th Cir. 2011) (internal quotation marks omitted). Summary judgment is proper where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In considering a motion for summary judgment, the district court must construe the evidence and draw all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The central issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

**B.    Disparate treatment**

Title VII makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).  The THRA does so as well.  *See* Tenn. Code Ann. § 4-21-401(a)(1); *see also Bailey v. USF Holland, Inc.*, 526 F.3d 880, 885 n.1 (6th Cir. 2008) ("The analysis of claims brought pursuant to the THRA is identical to the analysis used for Title VII claims.").

Jones alleges that the City violated these provisions by refusing to create a permanent light-duty position for him after learning that his physical limitations were unlikely to improve, by refusing to hire him for other positions for which he claims to have been qualified, by requiring him to retake a physical-agility exam in order to return to his previous position as a full-duty firefighter, and by suspending him for a day without pay and placing him on probation for a year following his failure to report the KKK incident.  Because Jones has provided no direct evidence that any of these actions were motivated by racial animus, his disparate-treatment claim will be analyzed under the burden-shifting framework set forth by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *See White v. Columbus Metro. Hous. Auth.*, 429 F.3d 232, 238 (6th Cir. 2005) (applying the *McDonnell Douglas* test where the plaintiff had produced only circumstantial evidence of discrimination).

Under the *McDonnell Douglas* framework, Jones bears the initial burden of establishing a prima facie case of discrimination.  This consists of four elements.  He must show that he (1) is a

member of a protected class, (2) was otherwise qualified for his job, (3) suffered an adverse employment action, and (4) was treated less favorably than a similarly situated individual outside the protected class. *See McDonnell Douglas*, 411 U.S. at 802. The district court held that Jones failed to make out a prima facie showing of discrimination because he could not meet the fourth element.

To be considered "similarly situated" under the fourth element, "the plaintiff and the employee with whom the plaintiff seeks to compare himself or herself must be similar in all of the relevant aspects." *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998) (internal quotation marks and emphasis omitted). If a plaintiff claims to have received a harsher punishment than similarly situated employees, for example, one way that the plaintiff could establish a prima facie case would be to show that the employees with whom the plaintiff seeks to compare himself or herself reported to the same supervisor, were subject to the same standards, and "engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *See Jackson v. FedEx Corporate Servs., Inc.*, 518 F.3d 388, 393 (6th Cir. 2008) (internal quotation marks omitted).

Jones attempts to meet the "similarly situated" requirement in a variety of ways. He first points to the white firefighters who were hired to the fire-inspector positions for which he had unsuccessfully applied. But he failed to establish that he had job qualifications similar to those of the successful white applicants, as is required by the fourth element of the prima facie test. *See White*, 429 F.3d at 242 (holding that, in the analogous failure-to-promote context, the fourth element requires "the plaintiff to establish that she and the non-protected person who ultimately was hired for the desired position had similar qualifications").

Jones alleges that he "applied to two fire inspector positions but was passed over for three white fireman," and that—presumably based on this factual statement alone— the white fireman were treated more favorably than he was. This plainly is not enough; bare-bones allegations and conclusory statements are a far cry from the specificity that the fourth element requires. *See Ercegovich*, 154 F.3d at 352; *Jackson*, 518 F.3d at 393.

Jones's other attempts to satisfy the "similarly situated" requirement fare no better. He argues that Wayne Mobley and another white firefighter had positions created for them after they had sustained injuries that limited their physical capabilities. But he does not set forth the nature or extent of their injuries. Nor does he state what kind of light-duty jobs the City created for the white firefighters, or how those jobs were different from the temporary light-duty work that the City provided for him in response to his injury.

Jones also asserts as evidence of discrimination that he was the first person who was required to retake a physical-agility exam after being injured on the job. But this argument suffers from the same defect as does his other arguments, only more so. Jones does not name anyone who received an on-the-job injury of any kind, let alone one similar to his, who was not required to retake the physical-agility exam in order to return to his previous position. Moreover, his argument is somewhat disingenuous. Retaking the physical-agility exam, after all, was *Jones's idea*. He asked to be retested in order to disprove his own doctor's negative assessment of his physical abilities, and the City allowed him to do so.

Finally, Jones contends that the discipline he received for failing to report the KKK incident was more severe than the discipline that a white firefighter, Assistant Chief Gentry Fox, had received two years earlier for failing to report an incident of racially offensive conduct up the chain of

command. Jones claims that this disparity in punishment—a one-day suspension and one year of probation versus a letter of counseling—is evidence of racial discrimination. However, as the district court properly reasoned: "Jones does not disclose the details of the discrimination that prompted the Fox reprimand, nor does he assert enough facts surrounding the event to prove that Fox was similarly situated." *Jones v. City of Franklin* (*Jones II*), No. 3:08-cv-1134, 2010 WL 2507771, at *12 (M.D. Tenn. June 18, 2010) (unpublished opinion). Moreover, the most obvious candidate for being "similarly situated" to Jones in this respect—Captain Mackey, a Caucasian who also failed to immediately report the KKK incident—received the *exact same punishment* as Jones. Jones never addresses this key fact.

In sum, Jones has not produced sufficient evidence to make out a prima facie case of racial discrimination. His disparate-treatment claim was therefore properly dismissed on summary judgment.

## C. Retaliation

Jones also alleges that the City unlawfully retaliated against him for exercising his civil rights—in this case, for filing complaints with the EEOC and bringing two lawsuits against the City. In making this claim, Jones relies on the anti-retaliation provision of Title VII, which forbids an employer from retaliating against an employee who "has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]." 42 U.S.C. § 2000e-3(a). As was the case with his disparate-treatment claim, Jones offers only circumstantial evidence to support his retaliation claim. *McDonnell Douglas* again supplies the relevant analytical framework. *Singfield v. Akron Metro. Hous. Auth.*, 389 F.3d 555, 563-64 (6th Cir. 2004) (applying *McDonnell Douglas* to a retaliation claim based on circumstantial evidence).

We begin with Jones's prima facie case. To establish a prima facie case for a retaliation claim, Jones must show that "(1) he engaged in activity protected by Title VII, (2) the [City] had knowledge of his exercise of his civil rights, (3) the [City] subjected him to an adverse employment action, and (4) a causal connection exists between the protected activity and the adverse employment action." *See id.* at 563.

Jones's argument for why he has satisfied all four of these elements can be summarized as follows: One, he engaged in protected activity when he filed complaints with the EEOC in January 2006 and February 2008. He also engaged in protected activity when he filed suits against the City in August 2006 and November 2008. Two, the City was aware of this activity. Three, Jones then suffered a variety of adverse employment actions. These include (a) the City's failure to create a permanent light-duty position for him following his injury, a decision that took place about 11 months after he had filed the *Jones I* lawsuit; (b) the City's refusal to offer Jones leadership training the year after he had filed the instant lawsuit; and (c) the City's discipline of Jones approximately two months after he had filed his complaint with the EEOC regarding the KKK incident. Finally, a causal connection exists because of the temporal proximity between the protected activity and the adverse employment actions.

The district court was not persuaded by this line of reasoning, concluding that (1) "temporal proximity is not enough to survive the summary judgment stage of litigation," and (2) Jones had not provided any "additional evidence to support a finding that the protected activity and the adverse action were connected." *Jones II*, 2010 WL 2507771, at *11. Although the district court reached the right result, its first conclusion does not fully square with Sixth Circuit precedent.

-11-

Temporary proximity *may*, in rare cases, be enough to establish a causal connection at the prima facie stage. Even the City acknowledges in its appellate brief that there are a "few instances" where this court has found that "temporal proximity alone could establish a causal connection," but in those cases "the time has usually been limited to less than six months."

One example of such a case is *Singfield v. Akron Metropolitan Housing Authority*, 389 F.3d 555 (6th Cir. 2004). In that case, this court expressly held that the temporal proximity of three months—there, the amount of time between the filing of an EEOC complaint and the termination of Singfield's employment—"is significant enough to constitute sufficient evidence of a causal connection for the purpose of satisfying Singfield's burden of demonstrating a prima facie case." *Id.* at 563.

Given this holding, there is perhaps a temporal-proximity argument to be made here, at least with respect to one of the allegedly retaliatory incidents. Jones filed his complaint with the EEOC on February 11, 2008. Then, about two months later, he was disciplined for the KKK incident. This time period, which is shorter than the temporal proximity found significant in *Singfield*, is arguably close enough to establish a causal connection at the prima facie stage.

But even assuming that this were so, and that Jones could make out a prima facie case of unlawful retaliation based on temporal proximity, his task would not end there. Under the *McDonnell Douglas* framework, "[d]espite the shifting burdens of production, the ultimate burden of persuasion remains at all times with the plaintiff." *Lindsay v. Yates*, 578 F.3d 407, 421 (6th Cir. 2009) (internal quotation marks omitted). Jones must therefore show that the City's proffered reason for disciplining him—his failure to report the KKK incident—was in fact a pretext designed to mask discrimination.

*See Akers v. Alvey*, 338 F.3d 491, 499 (6th Cir. 2003) (assuming that a prima facie case of retaliation had been established and analyzing pretext).

There are two good reasons why he has not been able to do so here. The first is that Jones was disciplined for a perfectly legitimate reason. He failed to report a racially offensive carving to his supervisor and, in so doing, violated City policy. His punishment was not disproportionate to his conduct. And the second reason reinforces the first: a similarly situated Caucasian employee—Mackey, who if anything, might have deserved less punishment because he at least eventually (albeit belatedly) reported the incident—was disciplined in exactly the same manner as was Jones. Jones has not responded to either of these arguments. If "an employee's discharge is readily explainable on non-retaliatory grounds that have not been shown to be pretextual," then temporal proximity by itself will "not support an inference of retaliatory discrimination." *Parks v. City of Chattanooga*, 74 F. App'x 432, 438 (6th Cir. 2003).

With respect to the other incidents that Jones claims constitute sufficient evidence to establish his prima facie case of unlawful retaliation, they fail for the reasons identified by the district court. *See Jones II*, 2010 WL 2507771, at *8. Jones has not shown that the temporal proximity between those allegedly adverse incidents and the protected activity is so close as to create a reasonable inference that the incidents were motivated by a desire to retaliate against him. The City's decision not to create a permanent light-duty position for Jones, for example, took place almost one year after he had filed *Jones I*. And Jones has not identified when in 2009 the City's refusal to offer him leadership training occurred. Crucially, Jones has offered no other evidence of retaliation that might overcome this shortcoming. His retaliation claim therefore fails as a matter of law.

D.     **Hostile work environment**

-13-

Jones's final claim against the City is that it violated Title VII and the THRA by failing to eliminate a racially hostile work environment. To succeed on this claim, he "must demonstrate that (1) [he] belonged to a protected group, (2) [he] was subject to unwelcome harassment, (3) the harassment was based on race, (4) the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment, and (5) the [City] knew or should have known about the harassment and failed to act." *See Williams v. CSX Transp. Co.*, 643 F.3d 502, 511 (6th Cir. 2011).

The evidence that Jones has provided in support of his hostile-work-environment claim can be divided into two categories: (1) the incidents that took place before his first lawsuit against the City in 2006, and (2) the incidents that took place after that lawsuit. Because these two categories are subject to two different modes of legal analysis, they are addressed separately below.

### 1. *Pre-***Jones I** *evidence*

The strongest evidence that Jones has submitted in support of his hostile-work-environment claim in this case is the same evidence that provided the factual basis for his hostile-work-environment claim in *Jones I*. That evidence includes allegations that black firefighters were routinely subject to racial slurs and racially derogatory remarks while on the job, that white firefighters carried Ku Klux Klan membership cards, and that white firefighters generally intimidated black firefighters based on their race. The district court refused to consider this evidence, however, because the court found that the evidence was barred by the doctrine of res judicata, more precisely referred to as the doctrine of claim preclusion.

Under that doctrine, "[a] final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action." *Federated*

*Dep't Stores v. Moitie*, 452 U.S. 394, 398 (1981). Claim preclusion thus consists of four elements: "(1) a final decision on the merits by a court of competent jurisdiction; (2) a subsequent action between the same parties or their privies; (3) an issue in the subsequent action which was litigated or which should have been litigated in the prior action; and (4) an identity of the causes of actions." *Rawe v. Liberty Mut. Fire Ins. Co.*, 462 F.3d 521, 528 (6th Cir. 2006) (internal quotation marks omitted).

There can be little doubt that the last three elements of the doctrine have been met here, because the same parties have previously litigated the same claim based in part on the same factual allegations. The more difficult question is whether the first element has been met.

In finding that it has been, the district court reasoned that, "[o]n January 23, 2008, Judge Echols granted the City of Franklin's motions for summary judgment in *Jones I*, dismissing with prejudice all of Jones's claims." *Jones II*, 2010 WL 2507771, at *7. But the hostile-work-environment claim in *Jones I* was dismissed because Jones had not included this claim in his EEOC complaint and, "[a]s a general rule, a Title VII plaintiff cannot bring claims in a lawsuit that were not included in his EEOC charge." *See Younis v. Pinnacle Airlines, Inc.*, 610 F.3d 359, 361 (6th Cir. 2010). In other words, the hostile-work-environment claim was dismissed in *Jones I* because Jones had failed to exhaust his administrative remedies.

This brings us to the question of whether the claim can be considered as having been dismissed on the merits. Our court has held that "a dismissal for failing to meet a condition precedent"—such as the exhaustion of administrative remedies—"is a decision on the merits only if the aggrieved party is permanently foreclosed from fulfilling the condition." *Mitchell v. Chapman*, 343 F.3d 811, 821 (6th Cir. 2003). Thus the critical issue is whether, at the time that *Jones I* was

-15-

dismissed, Jones was permanently foreclosed from going back to the EEOC and perfecting his complaint to include a hostile-work-environment claim.

Although this is an unsettled question, we need not answer it here because Jones has not challenged that aspect of the district court's opinion. In fact, his brief does not even mention the district court's claim-preclusion ruling. The issue has therefore been waived. *See Langley v. DaimlerChrysler Corp.*, 502 F.3d 475, 483 (6th Cir. 2007) (refusing to consider an issue on appeal in which the plaintiff had "failed to discuss or cite to the district court's analysis in any detail"); *see also Brindley v. McCullen*, 61 F.3d 507, 509 (6th Cir. 1995) ("We consider issues not fully developed and argued to be waived."). So the factual allegations that were contained in the *Jones I* complaint may not be considered in the present case.

### 2. *Post-**Jones I** evidence*

Taking the pre-*Jones I* evidence out of consideration, Jones is left with the following circumstances to support his hostile-work-environment claim: (1) the KKK incident, (2) the Polenzani emails, and (3) the factual evidence that he offered to support his disparate-treatment and retaliation claims. For different reasons, these three categories of evidence are insufficient to establish a prima facie case of a hostile work environment.

We will start with the KKK incident. To be actionable, that incident must have been "sufficiently severe or pervasive to alter the conditions of [Jones's] employment and create an abusive working environment." *See Williams v. CSX Transp. Co., Inc.*, 643 F.3d 502, 511 (6th Cir. 2011) (discussing the fourth element of a prima facie hostile-work-environment claim). In evaluating whether discriminatory conduct meets this standard, we look to the totality of the circumstances. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)*.* "These may include the frequency of the

discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.*

The anonymous carving of the letters "KKK" into the wall of a public restroom was unquestionably an insensitive and bigoted act. But it was also an isolated incident. And isolated incidents—even "insensitive, ignorant, and bigoted" ones, *Williams*, 643 F.3d at 513—"will not amount to discriminatory changes in the terms and conditions of employment" unless they are determined to be "extremely serious." *Id.* at 512 (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)); *see also Harris*, 510 U.S. at 21 (explaining that "mere utterance of an . . . epithet which engenders offensive feelings in an employee does not sufficiently affect the conditions of employment to implicate Title VII" (internal citation and quotation marks omitted)).

The KKK incident in this case, when viewed under the totality of the circumstances, did not alter the conditions of Jones's employment and create an abusive working environment. Jones was exposed to the carving on just one occasion, for only a brief moment, and did not report it to anyone within the Fire Department. Moreover, he has produced no evidence that other bathrooms (such as those within the Fire Department itself, which is his usual work environment) contained similar racially offensive graffiti. *Cf. Jackson v. Quanex Corp.*, 191 F.3d 647, 662 (6th Cir. 1999) (noting that "an abundance of racial epithets and racially offensive graffiti . . . may constitute severe and pervasive harassment"). The KKK incident therefore falls short of meeting the severe-or-pervasive requirement.

And even if the KKK incident were deemed sufficient to create an abusive work environment, Jones would still have to establish employer liability; *i.e.*, that the City "knew or should have known

about the harassment and failed to act." *See Williams*, 643 F.3d at 511. The record here establishes that he has not done so. To the contrary, the City immediately removed the KKK carving after Mackey reported of its existence, and there is no evidence in the record that the City knew about the carving prior to Mackey's report. On these facts, the City cannot be held liable for whatever effect the KKK incident may have had on Jones's work environment. The incident therefore cannot form the basis of his hostile-work-environment claim.

As for the allegedly discriminatory emails, we cannot ascertain their severity because they are not in the record. The only reference to their content is found in Jones's deposition testimony, where he refers to the fact that the emails contained a link to a website that he found racially insensitive and offensive. But his statement that the linked website "tells you all about what happened to African-Americans about lynching and all of that" is simply not enough to prove that the emails were so severe as to alter the conditions of Jones's employment and create an abusive working environment.

Finally, with respect to the last category of post-*Jones I* evidence on which Jones relies (the factual allegations supporting his disparate-treatment and retaliation claims), the district court concluded that Jones "has failed to meet the second requirement of his prima facie case, since he has failed to show that any of these actions were motivated by racial animus." *Jones II*, 2010 WL 2507771, at *10. We agree with the district court's analysis regarding these claims for the reasons set forth in Parts II.B. and II.C. above.

In sum, Jones failed to establish a prima facie case in support of his hostile-work-environment claim. The district court therefore did not err in dismissing the same on the City's motion for summary judgment.

### III. CONCLUSION

For all of the reasons set forth above, we **AFFIRM** the judgment of the district court.