MERRITT, J., delivered the opinion of the court. ROGERS (pp. 513-14), and WHITE (pp. 514-20), JJ., delivered separate opinions concurring in part and dissenting in part.
OPINION
MERRITT, Circuit Judge.
Plaintiff, Stephanie Williams, sued her employer, CSX Transportation Company, Inc. (“CSX”), for allegedly subjecting her to both racially and sexually hostile work environments. The district court held that Williams failed to file a document that meets the test for a “charge” with the Equal Employment Opportunity Commission on her claim of a sexually hostile work environment and, thus, failed to exhaust her administrative remedies. For that reason, the district court granted summary judgment to CSX on that claim. We disagree and reverse. As for Williams’s racially hostile work environment claim, the district court granted judgment as a matter of law to CSX at the close of Williams’s case in chief. The district court reasoned that her evidence of a racially hostile work environment was not sufficiently “severe” or “pervasive” to create a jury question. On that claim, and on a collateral evidentiary issue, we affirm.
I. Facts and Procedural Background
Stephanie Williams began working as a clerk for CSX at its Bruceton, Tennessee, facility in April 2002. CSX operates railroad lines. Clerks’ duties include, among other things, performing janitorial work. CSX’s Bruceton facility was small; there were four clerks, including Williams, and a few supervisors. Conductors and engineers would also pass through the Bruce-ton facility on a regular basis. Among her coworkers and supervisors at the Bruceton facility, Williams was the only black employee and the only female employee.
Williams alleges that, between 2002 and 2004, her supervisors treated her differently than her white male counterparts. First, she asserts that Ed Anderson, a supervisor, required her once to clean *506 feces off the walls of a restroom and out of a urinal, and that her white male counterparts never had to complete such a task. Second, Williams alleges that Anderson ordered her on four separate occasions to strip the restroom floor using an inappropriate tool. Williams requested a power tool from Anderson, who told her it was not in the budget. A different supervisor, Tim Magargle, once permitted a white male clerk to rent a power tool to complete the same task. Third, Williams alleges that Anderson refused to reimburse her for the mileage expense of driving her personal vehicle twice weekly during 2003 from Bruceton to New Johnsonville, Tennessee — even though corporate policy was to reimburse such mileage and the white male employees in her office received reimbursement. Fourth, Williams asserts that her car was vandalized: the right exterior was “keyed,” and the tires on the same wheel were punctured five successive times, resulting in five flat tires.
In addition to these incidents, Williams alleges that a single racist and sexist confrontation occurred at the CSX Bruceton facility. According to Williams, Jeff Win-go and Tim Magargle, two supervisors, were watching the Republican National Convention on television on the evening of September 2, 2004 when Williams entered and indicated she did not want to watch. Wingo allegedly told Williams that she was a Democrat only because she was a black woman; that unmarried women cannot “have the love of God in their heartfs]”; and that this country should “get rid of’ Jesse Jackson and Al Sharpton because without those two “monkeys” the country “would be a whole lot better.” The following day, Williams alleges that Wingo told her that if she returned to school, she would not have to pay for her education because she was a single black mother. Several days later, an anonymous caller, professing to be white, reported Wingo’s conduct to a CSX ethics hotline. The caller stated that Wingo “takes delight in harassing employees of other races.”
Williams also alleges that Wingo made two racist statements in passing to her between one to six months before the confrontation. Wingo once asked Williams why black people cannot name their children “stuff that people can pronounce, like John or Sue.” He also told Williams that black people should “go back to where [they] came from.” Notably, Williams does not allege that any of her coworkers or supervisors other than Wingo ever made a single sexist or racist remark.
Two months after the Wingo incident, on November 9, 2004, Williams lost her job at the Bruceton facility through multiple-step process. First, CSX eliminated the position of another one of the Bruceton clerks. That clerk then exercised his right under CSX policy to displace a more junior employee at the Bruceton facility, and that more junior employee in turn exercised his right to displace Williams- — -who had the shortest tenure of the four Bruceton clerks. After this occurred, Williams exercised her own displacement right to obtain a clerical position at CSX’s Nashville facility, which is located approximately one hundred miles from Bruceton.
Williams’s dislocation from Bruceton to Nashville precipitated the first of her two relevant administrative filings with the EEOC. In November 18, 2004, Williams filed a so-called “Charge Information Form” with the EEOC. In that filing, which spanned seven pages, Williams recounted the Wingo incident in detail. She alleged that the elimination of the other clerk’s position, which led to her dislocation to the Nashville facility, was in retaliation against her for the anonymous call to the CSX ethics hotline reporting the Win-go incident. She also alleged, indepen *507 dently, that her dislocation to the Nashville facility was an act of discrimination based on her race and sex. She expressly stated that the Bruceton facility was “a very hostile work environment.” Although Williams provided her signature at the bottom of the seventh page, she did not sign it under oath or penalty of perjury. Nothing on the “Charge Information Form” suggested a need to do so.
The EEOC office then completed for Williams a second filing, a so-called “Charge of Discrimination.” In a single page, this filing attempted to lay out the essence of Williams’s allegations. The general thrust was that discrimination and retaliation caused Williams’s dislocation to the Nashville facility. The allegations mentioned neither Wingo’s conduct nor any other indication of a hostile work environment; however, the second sentence stated that Williams was “subjected to unequal terms and conditions of [her] employment.” Within a field entitled “discrimination based on,” three boxes were marked: “race,” “sex,” and “retaliation.” Within a field entitled “date(s) discrimination took place,” the “earliest” date listed was September 2, 2004 (the date of the Wingo incident). Immediately below, the box indicating that the discrimination was a “continuing action” was marked. Unlike the “Charge Information Form,” this form prompted Williams to sign under a line stating that she “declare[d] under penalty of perjury that the above is true and correct.” Williams signed the form, under penalty of perjury, on December 30, 2004.[1]
Williams sued CSX in federal district court for discrimination, retaliation, and both sexually and racially hostile work environments. The district court granted summary judgment to CSX on what appeared to be Williams’s core claims: that her dislocation to the Nashville facility was the result of discrimination and retaliation. The district court found that Williams’s dislocation was caused by an employee-consolidation effort emanating from CSX’s corporate headquarters, not discrimination or retaliation. Williams does not appeal the disposition of those claims.
That left Williams’s two hostile work environment claims. As to her claim of a sexually hostile work environment, the district court granted summary judgment to CSX on the theory that Williams failed to exhaust her administrative remedies: she did not file a “charge” containing sufficient allegations of a hostile work environment. As to her claim of a racially hostile work environment (which did not require exhaustion), the district court permitted Williams to proceed to trial. At the close of Williams’s case in chief, however, the district court granted judgment as a matter of law to CSX. The district court believed that Williams’s evidence of a racially hostile work environment was not sufficiently “severe or pervasive” to create a jury question on that claim. Williams now appeals the district court’s judgments on her hostile work environment claims.
II. Sexually Hostile Work Environment
Williams asserts her claim of a sexually hostile work environment under Title VII of the Civil Rights Act of 1964. Before a plaintiff may sue under Title VII in federal court, she must first exhaust her adminis *508 trative remedies, one component of which is timely filing a “charge” with the EEOC. 42 U.S.C. § 2000e-5(e), (f); Younis v. Pinnacle Airlines, Inc., 610 F.3d 359, 362 (6th Cir.2010). Williams submitted two filings to the EEOC, but the district court held that neither of them were a “charge” for her claim of a sexually hostile work environment. To determine whether the district court was correct, we must determine what a filing must contain in order to be a “charge.”
Title VII does not define what constitutes a “charge.” Edelman v. Lynchburg College, 535 U.S. 106, 112, 122 S.Ct. 1145, 152 L.Ed.2d 188 (2002). The statute, however, does provide at least two necessary conditions for a filing to be a charge, and those requirements are fleshed out by interpreting regulations. First, “[cjharges shall be in writing under oath or affirmation....” 42 U.S.C. § 2000e-5(b). The EEOC regulations interpret this statutory command as requiring charges to be “verified.” See 29 C.F.R. § 1601.9 (“A charge shall be in writing and signed and shall be verified.”); 29 C.F.R. § 1601.3(a) (defining “verified” as “sworn to or affirmed” or “supported by an unsworn declaration in writing under penalty of perjury”). Second, “[cjharges ... shall contain such information and be in such form as the [EEOC] requires.” 42 U.S.C. § 2000e-5(b). The EEOC, in turn, has promulgated a regulation that identifies five piece of information that a charge “should” contain: (l)-(2) the names, addresses, and telephone numbers of the person making the charge and the charged entity; (3) a statement of facts describing the alleged discriminatory act; (4) the number of employees of the charged employer; and (5) a statement indicating whether the charging party has initiated state proceedings. 29 C.F.R. § 1601.12(a). The next subsection, however, qualifies these requirements by stating that a written charge is “sufficient” if it is “sufficiently precise to identify the parties, and to describe generally the action or practices complained of.” Id. § 1601.12(b).
A recent Supreme Court opinion added an “additional requirement” for an EEOC filing to constitute a charge. See Federal Express Corp. v. Holowecki, 552 U.S. 389, 398, 128 S.Ct. 1147, 170 L.Ed.2d 10 (2008).[2] Acknowledging that more than half of the filings the EEOC receives each year are mere informational inquiries rather than enforcement requests, the Court reasoned that the statutory term “charge” implies that a filing must be the latter. Id. at 399-401, 128 S.Ct. 1147. “[Ijf a filing is to be deemed a charge,” the Court held, “it must be reasonably construed as a request for the agency to take remedial action to protect the employee’s rights or otherwise settle a dispute between the employer and employee.” Id. at 402, 128 S.Ct. 1147. Put differently, a filing is a charge if an “objective observer” would believe that the filing “taken as a whole” suggests that the filer “requests the agency to activate its *509 machinery and remedial processes.” Id. at 398, 402, 128 S.Ct. 1147. “[Ujnder this permissive standard a wide range of documents might be classified as charges,” which is consistent with the principle that “pro se litigants are held to a lesser pleading standard than other parties.” Id. at 402, 128 S.Ct. 1147. In Holowecki, the plaintiffs “Intake Questionnaire” and accompanying six-page affidavit asked the EEOC to “[pjlease force Federal Express to end their age discrimination,” so the Court held the filing was “properly construed as a request for the agency to act” and, therefore, a charge. Id. at 405, 128 S.Ct. 1147.
To summarize, in order for an EEOC filing to constitute a “charge” that is necessary to exhaust an employee’s administrative remedies under Title VII, the filing (1) must be “verified” — that is, submitted under oath or penalty of perjury, 29 C.F.R. § 1601.3(a); (2) must contain information that is “sufficiently precise to identify the parties, and to describe generally the action or practices complained of,” id. § 1601.12(b); and (3) must comply with Holowecki — that is, an “objective observer” must believe that the filing “taken as a whole” suggests that the employee “requests the agency to activate its machinery and remedial processes,” 552 U.S. 389, 398, 402,128 S.Ct. 1147.
A. Williams’s “Charge Information Form” Is a “Charge”
We conclude that Williams’s first EEOC filing, the “Charge Information Form,” is a charge for her claim of a sexually hostile work environment. First, although the district court was correct that this filing was not initially verified, the district court overlooked a pertinent federal regulation: “A charge may be amended to cure technical defects or omissions, including failure to verify the charge....” 29 C.F.R. § 1601.12(b). The statute is silent on whether a filing may be amended to cure technical defects, and the EEOC’s interpretation is reasonable under Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). See Edelman v. Lynchburg College, 535 U.S. 106, 110, 114, 122 S.Ct. 1145, 152 L.Ed.2d 188 (2002) (giving Chevron deference to this same regulation). Williams signed her second EEOC filing, the “Charge of Discrimination” (discussed in more detail below), under penalty of perjury and, thus, verified it. For the technical purpose of verification, we conclude that Williams’s second filing amended — and verified — her first filing. This result is only fair in light of the fact that nowhere did the “Charge Information Form” suggest that Williams needed to sign it under penalty of perjury, and Williams was proceeding pro se at the time.
Second, Williams’s “Charge Information Form” contained information concerning a sexually hostile work environment that was “sufficiently precise to identify the parties, and to describe generally the action or practices complained of,” 29 C.F.R. § 1601.12(b). Williams identified CSX and its employee, Jeff Wingo, as the offenders. In the course of three pages, she recounted the Wingo incident in detail: Wingo allegedly told her that “the problem with this country” was that single mothers “can’t have the love of God in their hearts”; that women want equal rights “but aren’t paying equally”; and that, as a black woman, Williams only had to submit an application to get a job.
Third, Williams’s “Charge Information Form” satisfies the additional requirement of Holowecki: that an objective observer would believe that Williams sought the EEOC to activate its remedial machinery, rather than simply obtain information. *510 After recounting the details of her employment grievance, Williams expressly stated that the Bruceton facility was “a very hostile work environment” and that she “fe[lt] that [CSX] owe[d] [her] money damages.” Like the plaintiff in Holowecki, who asked the EEOC to “[p]lease force [the employer] to end [its] age discrimination plan,” 552 U.S. at 405, 128 S.Ct. 1147, Williams’s request for money damages was a request for the EEOC to act.
B. Williams’s “Charge of Discrimination” Is a “Charge”
We also conclude that Williams’s second EEOC filing, the “Charge of Discrimination,” is a charge for her claim of a sexually hostile work environment. First, Williams signed her name at the bottom of the filing in a signature block under a declaration that she “declare[d] under penalty of perjury that the above is true and correct.” Thus, the filing was verified.
Second, Williams’s “Charge of Discrimination” contained information concerning a sexually hostile work environment that is “sufficiently precise to identify the parties, and to describe generally the action or practices complained of,” 29 C.F.R. § 1601.12(b). The filing identified CSX, and specifically the Bruceton facility, as the alleged offender. Although the second filing is a single page and only contains three short paragraphs (apparently written by EEOC employees) about Williams’s employment grievance, it sufficiently indicated a sexually hostile work environment. The box for “sex” was marked. Within the field entitled “date(s) discrimination took place,” the “earliest” date listed was September 2, 2004 — the date when Wingo allegedly made the sexually hostile statements to Williams — and the box indicating that the discrimination was a “continuing action” was marked. These facts strongly suggest that the second filing complained not only of discrimination and retaliation in connection with the discrete incident of Williams’s dislocation to the Nashville facility, but also of a continuing sexually hostile work environment that existed while Williams worked at the Bruceton facility. Our conclusion is bolstered by Holowecki’s instruction that pro se EEOC filings, like Williams’s filings in this case, are to be liberally construed. 552 U.S. 389, 402, 128 S.Ct. 1147, 170 L.Ed.2d 10.
Third, Williams’s “Charge of Discrimination” easily satisfies the additional requirement created in Holowecki. Unlike the “Intake Questionnaire” in Holowecki, everything about Williams’s “Charge of Discrimination” suggests that Williams intended it to be a request for enforcement rather than an informational inquiry. CSX does not argue otherwise.
The district court erred in concluding that Williams had failed to file a charge of a sexually hostile work environment and, thus, had failed to exhaust her administrative remedies on this claim. Accordingly, we reverse the district court’s grant of summary judgment to CSX on Williams’s hostile work environment claim, and we remand for further proceedings.
III. Racially Hostile Work Environment
Williams also appeals her racially hostile work environment claim, on which the district court granted CSX judgment as a matter of law after Williams’s case in chief.[3] We review judgments as a matter of law de novo. Scotts Co. v. Cent. Garden & Pet Co., 403 F.3d 781, 788 (6th Cir.2005). *511 “[A] court should render judgment as a matter of law when ‘a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue.’ ” Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 149, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) (quoting Fed. R. Civ.P. 50(a)). “[Although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe.” Id. at 151, 120 S.Ct. 2097.
To succeed on a claim of a racially hostile work environment, a plaintiff must demonstrate that (1) she belonged to a protected group, (2) she was subject to unwelcome harassment, (3) the harassment was based on race, (4) the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment, and (5) the defendant knew or should have known about the harassment and failed to act. Moore v. KUKA Welding Sys. & Robot Corp., 171 F.3d 1073, 1078-79 (6th Cir. 1999).[4] The parties agree that the first two elements are satisfied here; their dispute centers on the existence of a jury question on the third and fourth.
With respect to the fourth element, “whether an environment is ‘hostile’ or ‘abusive’ can be determined only by looking at all the circumstances.” Harris v. Forklift Sys., Inc., 510 U.S. 17, 23, 114 S. Ct. 367, 126 L.Ed.2d 295 (1993). When analyzing that element, we must consider harassment “by all perpetrators combined,” rather than “dividing] and categorizing] the reported incidents.” Williams v. Gen. Motors Corp., 187 F.3d 553, 562 (6th Cir.1999).[5] However, the third element limits the scope of this analysis: only harassment based on the plaintiff’s race may be considered. See Bowman v. Shawnee State Univ., 220 F.3d 456, 464 (6th Cir.2000). Accordingly, we will first determine what harassment was based on Williams’s race, then we will ask whether the totality of that harassment was sufficiently severe or pervasive to create a jury question on her claim.
A. Based on Race
A plaintiff may prove that harassment was based on race by either (1) direct evidence of the use of race-specific and derogatory terms or (2) comparative evidence about how the alleged harasser treated members of both races in a mixed-race workplace. See Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 80-81, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998) (approving these methods in the analogous context of sexual harassment). Harassment is based on race when it would not have occurred but for the plaintiffs race; the harassing conduct need not be overtly racist to qualify. Clay v. United Parcel Serv., Inc., 501 F.3d 695, 706 (6th Cir.2007).
Williams alleges, in essence, three categories of racial harassment: her *512 supervisor Jeff Wingo’s racist statements to her, the damage to her personal vehicle, and other adverse treatment at work. Wingo’s racist statements are plainly based on race. Just as plainly, a reasonable jury could not find that the damage to Williams’s personal vehicle was based on race. Williams has no direct evidence of racial causation. She did not witness the alleged vandalization, and she presented no evidence suggesting that CSX employees were the vandals, or even that the alleged vandalization happened while she was at work. Moreover, her comparative-evidence argument — that the vehicles of her white counterparts were not damaged — is weakened by the uncontroverted testimony of two of her eoworkers that flat tires are common at the Bruceton facility.
A slightly closer question is whether a reasonable jury could find that the other adverse treatment Williams experienced at work was based on her race. Williams alleges that Ed Anderson, a supervisor, forced her to clean feces out of a urinal and off of a restroom wall; ordered her to strip a bathroom floor with an inappropriately small device and denied her request to rent a power tool; and refused to reimburse her for the mileage cost of driving her personal vehicle for work, even though corporate policy was to reimburse mileage and white employees received reimbursement.
Williams lacks any direct evidence that any of this adverse treatment was based on her race. None of it involved the use of racist language. Nor does Williams allege that Anderson, the relevant supervisor in each instance, ever used racist language. The mere fact that Wingo used such language does not imply that Anderson harbored the same prejudices.
Williams’s comparative-evidence argument is also ultimately unpersuasive. Regarding her feces-cleaning assignment, Williams concedes that janitorial tasks fall within her job duties, and she presents no evidence that any of her white counterparts were available to clean the bathroom on that day. As for her stripping the bathroom floor, Williams presents no evidence that Anderson ever permitted a white employee to rent a power tool to complete the task. The fact that Tim Ma-gargle, a different supervisor, once permitted a white employee to rent a power tool sheds no light on Anderson’s motivations. And as for the reimbursement of her mileage, Williams admitted that every time she submitted the appropriate expense form, CSX reimbursed her. Accordingly, no reasonable jury could find that these other alleged instances of adverse treatment were based on Williams’s race. The only race-based instances of harassment are Wingo’s racially derogatory statements.
B. Severe or Pervasive
We must next consider whether the totality of Williams’s race-based harassment was “sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment.” Harris v. Forklift Sys., Inc., 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993). Factors to consider include “the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee’s work performance.” Id. at 23, 114 S.Ct. 367. Significantly, “isolated incidents (unless extremely serious) will not amount to discriminatory changes in the ‘terms and conditions of employment.’ ” Faragher v. City of Boca Raton, 524 U.S. 775, 788, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998). Occasional offensive utterances do not rise to the level required to create a hostile work environment. Grace v. US- *513 CAR, 521 F.3d 655, 679 (6th Cir.2008). “To hold otherwise would risk changing Title VII into a code of workplace civility, a result we have previously rejected.” Id. (internal quotation marks omitted).
Although despicable, Wingo’s alleged racist statements are not sufficiently “severe” or “pervasive” standing alone to create a jury question on Williams’s racially hostile work environment claim. The statements were isolated, not pervasive: all but two occurred over a two-day period. Nor were they sufficiently “severe” for Williams to be able to prevail on a racially hostile work environment claim. Those statements — for example, calling Jesse Jackson and Al Sharpton “monkeys” and saying that black people should “go back to where [they] came from” — are certainly insensitive, ignorant, and bigoted. But they more closely resemble a “mere offensive utterance” than conduct that is “physically threatening or humiliating.” Harris, 510 U.S. at 23, 114 S.Ct. 367. Accordingly, we affirm the district court’s grant of judgment as a matter to law to CSX on this claim.
IV. Admissibility of a Corporate Ethics Hotline Report
Finally, Williams appeals the district court’s decision on a collateral evidentiary issue. As mentioned above, an anonymous caller phoned the CSX ethics hotline shortly after the Wingo incident. CSX generated a report of the call. According to that report, the caller said that Wingo insulted Williams and “the rest of the [b]lack race,” that Wingo “takes delight in harassing employees of other races,” and that “Wingo does not deserve to be in a managerial role if he cannot curb his excesses.” The caller, who professed to being white, also reported that “[t]he morale of employees has been affected by this uncouth behavior.”
Williams sought to introduce the report into evidence, but the district court held it to be inadmissible hearsay. Williams argues on appeal that the statements were not hearsay because she offered them to prove that CSX had notice of the harassment, rather than the truth of the matter asserted, see Fed.R.Evid. 801(c). The fatal flaw in Williams’s argument is that whether CSX had notice of that incident is irrelevant for the only claim that was submitted to the jury: her failure-to-promote claim, which she does not appeal. Although an employer’s notice and inadequate response are necessary components of a hostile work environment claim, Moore v. KUKA Welding Sys. & Robot Corp., 171 F.3d 1073, 1078-79 (6th Cir.1999), those issues are simply not part of the framework of a failure-to-promote claim, see White v. Baxter Healthcare Corp., 533 F.3d 381, 391-92 (6th Cir.2008) (positing the four-part test for failure-to-promote claims). And Williams’s racially hostile work environment claim fails for the reasons given in Part III above — that is, isolated racist remarks by a single supervisor are not “severe” or “pervasive”— irrespective of the contents of the CSX hotline report. Accordingly, the CSX hotline report was inadmissible hearsay, and the district court properly excluded it from evidence.
V. Conclusion
For these reasons, we REVERSE the district court’s grant of summary judgment to CSX on Williams’s sexually hostile work environment claim, and we AFFIRM the district court’s judgment as a matter of law to CSX on Williams’s racially hostile work environment claim.

. The EEOC later completed for Williams a third filing, another "Charge of Discrimination,” which alleged that CSX discriminated and retaliated against Williams by failing to promote her to the position of substitute yardmaster. Williams eventually sued CSX on a failure-to-promote claim, in addition to her other claims. The failure-to-promote claim went to trial, and the jury found in favor of CSX. Williams does not appeal the judgment on that claim.

. Holowecki interpreted the term "charge” as used in the Age Discrimination in Employment Act ("ADEA”), rather than in Title VII of the Civil Rights Act of 1964, and the Court began with a "cautionary preface” that lower courts should proceed with "careful and critical examination” before applying its interpretation to Title VII. 552 U.S. at 393, 128 S.Ct. 1147. However, "numerous courts have applied Holowecki in the Title VII context because of the similarities between the statutory schemes of the ADEA and Title VII concerning exhaustion of administrative remedies.” Palmer v. Southwest Airlines Co., No. 08 C 6158, 2009 WL 3462043, at *5 n. 3 (N.D.Ill. Oct. 23, 2009) (citing cases). Moreover, the regulation under the ADEA setting forth the information a filing must contain to be a charge is essentially identical to its counterpart regulation under Title VII. Compare 29 C.F.R. § 1626.8(a)-(b), with 29 C.F.R. § 1601.12(a)(b). The parties here agree that Holowecki applies.

. Williams did not have to file a "charge” for this racial claim because she asserted it under 42 U.S.C. § 1981, which does not require the exhaustion of administrative remedies.

. This five-element test is usually posited for claims brought under Title VII, but we apply the same test to claims, as here, brought under § 1981. See Jackson v. Quanex Corp., 191 F.3d 647, 658 (6th Cir.1999) ("We review claims of alleged race discrimination brought under § 1981 ... under the same standards as claims of race discrimination brought under Title VII....").

. Although the Williams case dealt with a claim of a sexually hostile work environment rather than a racially hostile work environment, this Court may draw from cases involving a sexually hostile work environment. See, e.g., Jackson v. Quanex Corp., 191 F.3d 647, 658 (6th Cir.1999) ("[T]he same principles that govern sexual harassment also govern claims of racial harassment.”).