**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**

File Name: 14a0129n.06

**Case No. 13-5797**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

|  |  |  |
|---|---|---|
| CHARLES E. REED, | ) | **FILED** |
|  | ) | Feb 13, 2014 |
| Plaintiff-Appellant, | ) | DEBORAH S. HUNT, Clerk |
|  | ) |  |
| v. | ) | ON APPEAL FROM THE |
|  | ) | UNITED STATES DISTRICT |
|  | ) | COURT FOR THE WESTERN |
| PROCTER & GAMBLE MANUFACTURING | ) | DISTRICT OF TENNESSEE |
| COMPANY, | ) |  |
|  | ) |  |
| Defendant-Appellee. | ) |  |
|  | ) | O P I N I O N |

BEFORE:     COLE and GRIFFIN, Circuit Judges; PEARSON, District Judge.[*]

COLE, Circuit Judge.    Charles Reed, a longtime employee at Procter & Gamble's Pringles plant in Tennessee, appeals the district court's grant of summary judgment on Reed's employment discrimination claims under Title VII, 42 U.S.C. § 2000e *et seq.*, and the Tennessee Human Rights Act, Tenn. Code. Ann. § 4–21–401 *et seq*.   Specifically, Reed, who is African-American, alleges that he was subject to disparate treatment on the basis of his race, that he was removed from a particular position at the plant in retaliation for reporting discrimination, and that the plant fostered a hostile work environment.   We affirm the district court's grant of summary judgment on all of Reed's claims.

---

[*]The Honorable Benita Y. Pearson, United States District Judge for the Northern District of Ohio, sitting by designation.

## I. BACKGROUND

### A. Factual Background

Reed began working for Pringles as a Technician, Level 1 ("T1") in April of 1996. He remained employed with Pringles until Procter and Gamble ("P&G") sold the plant in June of 2012. During his employment, Reed was twice promoted: first, to Technician Level 2 in 1997, and again to Technician Level 3 in 2003.

The structure of the Pringles plant necessitates some explanation. As P&G describes it, employees participated in a "high performance work system" that required them to "develop a broad range of skills and knowledge." Most Pringles employees did not stay in one position within the plant permanently; instead, employees periodically rotated through different departments. However, employees in some positions—labeled "extended roles"—did not rotate regularly. Extended role positions typically required more training than regular positions, involved exposure to confidential information, or demanded knowledge of environmental or legal compliance requirements.

Reed's allegations of discrimination stem from three primary sources: (1) management's decision to remove him from an extended role position on or about October 24, 2008; (2) his inability to attain a promotion to Technician Level 4 ("T4") status, and management's alleged failure to offer him the coaching necessary for promotion; and (3) a variety of incidents in the workplace that, according to Reed, indicate the existence of a hostile work environment. Additionally, Reed alleges that he engaged in two forms of protected activity that prompted P&G's management to retaliate against him by taking the above actions. First, he assisted a co-worker, Reginald Charles, in making internal complaints of racial discrimination at the plant, and

second, Reed also personally complained of discriminatory treatment, by sending a letter to Kristen King, an employee in the human resources department, on October 5, 2008, and by speaking with King and Frank Napadek, Site Human Resources Manager, sometime thereafter. However, P&G disputes Reed's assertion that the October 5 letter made any clear allegations of racially discriminatory treatment. Reed further claims that he spoke with Brandy Lennon, another employee in the plant's human resources department, about racial discrimination prior to his conversations with King and Napadek.

Turning first to the change in Reed's position, in October of 2008, Jeffrey Bruns, the Site Quality Manager, decided to eliminate two out of four particular extended role positions. Bruns reached this conclusion after consultation with several other members of management, including Stuart Massey, a T5 and Team Leader of a department then including Reed. All four of the individuals in the positions eligible for elimination were African-American. Reed and another technician were chosen for removal from extended roles, although Reed actually stayed in his extended role until January of 2010, over a year later.

Reed alleges that management's decision to eliminate his extended role position was retaliatory. P&G claims that it made a legitimate business decision after Napadek determined that "the regular rotation schedule . . . had not been managed closely," resulting in an excessive number of extended roles. Reed responds that the number of extended role positions, thirty-five, was not excessive given the size of the plant and its policy of placing up to 5% of technicians in extended roles. It is undisputed that Napadek played no role in determining which employees would be affected. Additionally, Reed agrees with P&G's statement that "there was already 'talk'" of reducing the number of extended roles as of October 5, 2008, the date of Reed's letter to King.

Next, Reed alleges that he was denied a promotion from T3 to T4 status. The parties generally agree on the processes by which employees could become eligible for promotion. In Reed's department, technicians would determine whether they wished to pursue a promotion and would then consult with their Team Leader, Massey, to develop a "work plan" aimed at meeting the requirements necessary for promotion. Ultimately, Bruns would decide whether a particular employee would be promoted. As can be gathered from the record, once an employee decided to pursue a promotion, he or she would then attend so-called "pre-gap" or "gap" meetings with management to discuss the employee's qualifications for promotion. From 2005 to 2009, Massey approved Reed's work plans, which included attaining T4 status as a goal. However, Reed maintains that Massey assisted employees with their promotional goals on a discriminatory basis: he alleges that Massey approached one White employee to ask if he wanted to attain T4 status, rather than waiting for the employee to come to him, and that he delayed Reed's "T4 pre-gap assessment" while expediting those of White employees.

Reed complained of inequities in the promotion process in his letter to King, dated October 5, 2008. In particular, Reed stated, "I can not [sic] seem to get my coach or manager to support my promotional initiative," and he posited that "some issues" pertaining to his qualifications "have been fabricated for the purpose of being discriminatory." The letter also named three other T3 technicians seeking T4 status and alleged that management was not following its internal procedures but "predetermin[ing]" the individuals to be selected for promotion. Reed does not dispute that one of these three individuals, who is White, did not achieve the T4 promotion.

In response to the letter, Napadek arranged a pre-gap meeting for Reed, held on November 6, 2008. Napadek attended, along with Reed, Massey, and Lennon. Before the

meeting, Reed provided Massey with an "action plan" that Reed used to evaluate his own progress toward fulfilling requirements for T4 status. Reed admitted in his deposition that he had not considered himself to have completed all the requirements and that he rated his progress as "poor versus [the] plan" in several areas, which Reed described as meaning that the requirement in question was "not at the completion stage."

The parties agree that Reed's pre-gap meeting lasted two hours, that the participants reviewed about half of the requirements for T4 promotion, and that Bruns concluded that Reed did not fulfill any of the requirements discussed in the meeting. Reed, however, alleges that the other attendees were dismissive and hostile toward him. Napadek and Reed also held a follow-up meeting on November 13, at which time Reed complained that his colleagues were "treating him differently" and that he believed his progress toward T4 status was stalled. He further communicated that he "felt he was treated differently because of his race."

The parties also agree that Reed never met all of the requirements necessary for T4 promotion, and that a White woman who was promoted did meet all the requirements. Reed claims, however, that he met "over 75% of the requirements," which should have "trigger[ed] a gap assessment" that Massey and Bruns avoided holding until Reed made his complaints to King and Napadek. He further alleges that the deficiencies discussed in the meeting were fabricated or exaggerated and that White employees had prior opportunities to meet with management regarding their promotional aspirations, whereas he did not.

Reed also makes allegations of a hostile work environment. In particular, he claims that he received a "threaten[ing]" email and a "hostile" phone call from Massey, that Massey created a noose from a telephone cord when Reed was in Massey's presence but unable to see the gesture, and that Reed heard racial slurs in the workplace, was excluded from lunches with

colleagues, was made "the victim of a prank where [his] head and face [were] splashed with an unknown solution," and was given the cold shoulder by his managers. As discussed below, Reed furnishes few details about these events. Reed spoke with Bruns about the phone call and email, but did not clearly communicate to Bruns that he believed Massey was motivated by racial animus. Reed also does not dispute that he did not bring up any concerns about racial discrimination in the promotion process with Bruns directly.

### B. Procedural History

Reed filed an EEOC charge against P&G in March of 2009 and subsequently received a right-to-sue letter on July 30, 2010. *See* 42 U.S.C. § 2000e–5(e) & (f). He timely filed suit in district court. P&G moved for summary judgment under Federal Rule of Civil Procedure 56, and the court found deficiencies in Reed's initial response in opposition. In particular, Reed had neglected to refer to specific portions of his deposition testimony when disputing facts set forth by P&G, had failed to place his deposition transcript in the record, and had not used his affidavit to establish facts based on personal knowledge, but to cite to other portions of the record, again without pinpoint citations. The court ordered Reed to submit an amended and properly supported response to P&G's statement of undisputed facts, accompanied by all relevant evidence indicating the existence of a genuine issue of fact, in lieu of his deficient filings. The court also denied Reed's request to file a sur-reply. Reed submitted amended filings, but again neglected to attach relevant portions of his deposition transcript, causing the court to issue an order to show cause as to why Reed's counsel should not be held in contempt for failure to comply. Reed timely responded with the transcripts.

Additionally, Reed filed a motion for reconsideration of the court's decision to disregard Reed's original affidavit. After holding a hearing on this matter, the court allowed Reed to file an amended affidavit and a second amended response to P&G's statement of disputed facts.

In deciding P&G's motion for summary judgment, the district court confined its analysis of the record to the following items: P&G's statement of undisputed facts and its supporting exhibits (R.41), Reed's second amended response to P&G's statement of undisputed facts and his supporting exhibits, including his corrected summary judgment affidavit (R.70), and "any other portion of the record cited by [Reed] in his second amended response and not previously stricken by the [c]ourt."

In February of 2013, the court granted in part P&G's motion for summary judgment, holding that Reed had failed to show the existence of a material dispute of fact on the following theories: (1) direct evidence of disparate treatment, (2) circumstantial evidence of disparate treatment based on failure to train and failure to promote, (3) retaliation, and (4) hostile work environment. The court did not, however, grant summary judgment on Reed's theory of mixed-motive failure to promote; instead, it ordered additional briefing on this issue. The parties complied, and the court then dismissed Reed's remaining claim in May of 2013.

## II. ANALYSIS

Reed challenges the district court's grant of summary judgment on all his claims for failure to promote, retaliation, and hostile work environment, as well as the court's decision to strike his original affidavit and its refusal to consider certain evidence that Reed submitted on the basis that it could not have been admissible at trial.

**A. Summary Judgment: Standard of Review**

We review the district court's grant of summary judgment de novo. *White Consol.
Indus., Inc. v. Westinghouse Elec. Corp.*, 179 F.3d 403, 407 (6th Cir. 1999). Summary judgment
is appropriate only if the moving party "shows that there is no genuine dispute as to any material
fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To defeat
the motion, the non-moving party must then "go beyond the pleadings and by her own affidavits,
or by the depositions, answers to interrogatories, and admissions on file, designate specific facts
showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324
(1986) (internal quotation marks omitted). The "mere existence of a scintilla of evidence" will
not suffice; rather, the party opposing summary judgment must put forth "evidence on which the
jury could reasonably find" in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252
(1986). A moving party can succeed by demonstrating "that there is an absence of evidence to
support the non-moving party's case." *Celotex*, 477 U.S. at 325. We construe the evidence "in
the light most favorable" to the non-moving party. *White Consol. Inds.*, 179 F.3d at 407.

**B. The Extent of the Record**

We review a district court's evidentiary rulings—including its refusal to consider part or
all of an affidavit submitted in opposition to summary judgment—for abuse of discretion. *See
Briggs v. Potter*, 463 F.3d 507, 511 (6th Cir. 2006); *see also Flagg v. City of Detroit*, 715 F.3d
165, 175 (6th Cir. 2013). "A district court abuses its discretion when it relies on erroneous
findings of fact, applies the wrong legal standard, misapplies the correct legal standard when
reaching a conclusion, or makes a clear error of judgment." *Briggs*, 463 F.3d at 511 (citation
omitted). Reed challenges the district court's striking of his original affidavit, (R.44-4), from the

record, as well as its refusal to consider, first, deposition testimony in which Reed recounts a conversation with Brandy Lennon, and second, his submission of an internal P&G memorandum.

Looking first to Reed's original affidavit, the court noted that it failed to conform with Federal Rule of Civil Procedure 56(c)(4), which requires an affidavit to be "made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Instead of following these guidelines, Reed's original affidavit read like an additional response to P&G's statement of undisputed facts. It also frequently cited to Reed's deposition testimony without providing page or line numbers, and without supplying the deposition transcript. Furthermore, it made conclusory assertions not based on personal knowledge, such as stating that management's rationale for reducing the number of extended roles was "pretext to mask the true retaliatory motive," and that "Frank Napadek did not thoroughly investigate" Reed's complaints. We find that the court did not abuse its discretion in striking from the record an affidavit that partially neglected to conform to Rule 56(c)(4) and that functionally duplicated another filing—Reed's response to P&G's statement of undisputed facts—where the court gave Reed the opportunity to file a new affidavit. *Cf. Briggs*, 463 F.3d at 511–14 (no abuse of discretion in striking portion of affidavit making "argumentative interpretation of statements of fact"); *Plott v. General Motors Corp.*, 71 F.3d 1190, 1196–97 (6th Cir. 1995) (applying abuse of discretion standard to appellant's claim that the court granted summary judgment before discovery was complete, and considering whether appellant was prejudiced by his inability to obtain desired discovery). Significantly, Reed does not demonstrate that he was in any way prejudiced by the court's decision.

As for Reed's other two evidentiary claims, we likewise find no abuse of discretion. The district court refused to consider Reed's submission of an internal P&G memorandum from 2000

on the basis that it was not properly authenticated. Furthermore, it disregarded Reed's testimony that Lennon had reported his concerns about racial discrimination to Massey on the grounds that Lennon's statements to Reed were inadmissible hearsay. While "[t]he submissions"—such as affidavits—"by a party opposing a motion for summary judgment need not themselves be in a form that is admissible at trial," that party must "lay[] out enough evidence that will be admissible at trial to demonstrate that a genuine issue on a material fact exists." *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009) (emphasis in original) (internal quotation marks and citation omitted); see also Fed. R. Civ. P. 56(c)(1)(A) & (4) (requiring an affidavit or declaration to "set out facts that would be admissible in evidence"). Therefore, hearsay evidence not subject to any exception "must be disregarded." *Alexander*, 576 F.3d at 558 (internal quotation marks and citation omitted). For the same reason, unauthenticated documents do not suffice. *Id.* at 558–59. Reed failed to authenticate the internal memorandum and neglected to obtain an affidavit or any other statement from Lennon; accordingly, we cannot say that the district court erred in declining to consider this evidence. Thus, we agree with the district court as to the scope of the record, and we review the same evidence considered below.

## C. Race Discrimination

In district court, Reed alleged that he was subjected to three adverse employment actions indicative of disparate treatment on the basis of his race: first, his removal from an extended role position; second, his failure to be promoted to T4 status; and third, his denial of the training or coaching necessary for promotion. Because Reed's brief contains no discussion of his removal from his extended role position in the context of disparate treatment, we do not address this claim. *See Chandler v. Vulcan Materials, Inc.*, 81 F. App'x 538, 542 (6th Cir. 2003) (claims waived if not addressed on appeal). In order to survive summary judgment, Reed must present

either direct or circumstantial evidence that these actions were motivated, in whole or in part, by racial animus.

We begin by noting that the record lacks evidence of direct discrimination. *See Johnson v. Kroger Co.*, 319 F.3d 858, 865 (6th Cir. 2003) ("[D]irect evidence is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions" (citation omitted)); *see also Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000) (referring to "a facially discriminatory employment policy or a corporate decision maker's express statement of a desire to remove employees in the protected group" as "direct evidence of discriminatory intent"). Thus, we assess Reed's allegations using the *McDonnell Douglas* approach: if Reed can establish a prima facie case of racial discrimination, the burden shifts to P&G to offer a legitimate, non-discriminatory rationale for its employment actions. Reed can then prevail by showing that the stated rationale is pretextual. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–05 (1973); *Johnson*, 319 F.3d at 865–66. To put forth a prima facie case, Reed must show that "(1) he was a member of a protected class; (2) that he suffered an adverse employment action; (3) that he was qualified for the position; and (4) that a person outside the protected class was treated more favorably than him." *Braithwaite v. Timken Co.*, 258 F.3d 488, 493 (6th Cir. 2001); *see also Clay v. United Parcel Serv., Inc.*, 501 F.3d 695, 703 (6th Cir. 2007).

Alternatively, Reed can avoid summary judgment by showing that race "was a motivating factor for the defendant's adverse employment action." *Griffin v. Finkbeiner*, 689 F.3d 584, 595 (6th Cir. 2012) (emphasis in original); see also White v. Baxter Healthcare Corp., 533 F.3d 381, 400 (6th Cir. 2008) (holding "that the *McDonnell Douglas/Burdine* burden-shifting framework does not apply to the summary judgment analysis of Title VII mixed-motive

claims" (emphasis in original)). Evidence establishing a mixed motive may be circumstantial.

See *Griffin*, 689 F.3d at 595.

In addition to his federal claims under Title VII, Reed alleges violations of the Tennessee

Human Rights Act ("THRA"), which forbids "discrimina[tion] against an individual with respect

to compensation, terms, conditions or privileges of employment because of such individual's

race." Tenn. Code Ann. § 4–21–401(a)(1). Although the degree to which the THRA and Title

VII are coextensive is a subject of some debate, see *Bobo v. United Parcel Serv., Inc.*, 665 F.3d

741, 757–58 (6th Cir. 2012), we need not consider this issue because the district court granted

summary judgment using Title VII's legal framework, and Reed does not argue on appeal that

Tennessee law compels a different analysis. *See Chandler*, 81 F. App'x at 542.

### 1. Failure to Promote

To establish a prima facie case of failure to promote within the burden-shifting

framework, Reed must demonstrate that he applied for and was qualified for the promotion to T4

status and that individuals with similar qualifications outside of his protected class were

promoted, whereas he was not. *See Grizell v. City of Columbus Div. of Police*, 461 F.3d 711,

719 (6th Cir. 2006). The denial of a promotion is unquestionably an adverse employment action.

*Nguyen*, 229 F.3d at 562. However, Reed is unable to make out a prima facie case because he

has not demonstrated that he was qualified for the promotion. Rather, Reed admits that he met

"over 75%" of the requirements. Additionally, in the self-evaluation he conducted prior to his

pre-gap meeting, Reed noted that he was missing some of the criteria necessary to make him

eligible for promotion. Reed urges us to consider declarations from two of his colleagues, both

stating that they believed Reed was qualified for promotion. But these statements do not counter

the evidence that neither Reed nor his supervisors believed that Reed had met all of the

requirements for promotion at the time of their pre-gap meeting. Nor does Reed dispute P&G's statement that he did not subsequently update his list of requirements or request another meeting to reconsider his candidacy.

We note that Reed could establish a prima facie case of failure to promote notwithstanding his missing qualifications. In order to do so, he would have to put forth evidence demonstrating that employees outside of his protected class were promoted even though they, too, did not fulfill all the requirements. *See White v. Columbus Metro. Housing Auth.*, 429 F.3d 232, 241–43 (6th Cir. 2005). But he has not argued that this was the case.

Turning to a mixed-motive analysis, the record does not indicate that Bruns—who had the authority to promote Reed to T4—declined to promote Reed in whole or in part because of his race. See *White*, 533 F.3d at 404. The record contains no evidence indicating that Bruns harbored animus against African-Americans. *See id*. Reed does identify instances suggesting that some other employees at the plant felt and expressed such animus, but he does not identify facts to indicate that these employees influenced Bruns. *See id.*; *see also Cobbins v. Tenn. Dep't of Transp.*, 566 F.3d 582, 587 n.5 (6th Cir. 2009) (discussing the "cat's paw" theory of disparate treatment). Furthermore, although the declaration of Reginald Charles attests that he "personally witnessed racial discrimination" and heard "racial slurs by individuals in leadership positions," these general statements shed no light on Bruns's motivations, or, for that matter, the motivations of any other individuals. *See Griffin*, 689 F.3d at 595 ("[R]acially insensitive statements . . . are sufficient evidence of racial animus only if they have some connection to" the adverse employment action.).

Although Reed does not dispute that Bruns ultimately decided whether an employee would be promoted, Massey also played a role in Reed's efforts to attain a promotion. But

because Massey did not have the authority to promote Reed and was instead responsible for assisting his efforts to be promoted, Massey's involvement is more appropriately considered within the context of Reed's failure-to-train allegations. We affirm the district court's grant of summary judgment on Reed's claim of failure to promote.

### 2. *Failure to Train*

In the district court, Reed alleged that he was denied training or coaching opportunities, necessary to attain T4 status, that two particular White employees were granted. The district court held that Reed's inability to receive training could not withstand summary judgment because it was not an adverse employment action. In doing so, the court erred. This circuit has concluded that "a deprivation of increased compensation as the result of a failure to train constitutes an adverse employment action." *Clay*, 501 F.3d at 710 (noting that delaying training opportunities may constitute an adverse employment action); *see also Vaughn v. Louisville Water Co.*, 302 F. App'x 337, 345 (6th Cir. 2008) (finding that change in job title, which made employee ineligible to attain certain training sessions, was not adverse employment action, as employee "failed to present any evidence that she was passed up for promotions because of her inability to attend the . . . training" (emphasis added)).

Here, the record indicates that T4 technicians were more highly compensated than T3s, and the parties agree that, to be promoted, an employee needed the support of his or her supervisors. The record also contains a 2006 performance evaluation, signed by Reed and Massey, indicating that Reed could likely "attain T4 [status] within the next 12 months with coaching and support from the lab." The law and the facts indicate that Reed's failure-to-promote claim should not have been dismissed on the grounds that he did not suffer an adverse employment action.

However, we affirm the district court's grant of summary judgment because Reed has neglected to present his failure-to-train claim to this court on appeal. This claim is not named in Reed's statement of issues presented for review, *see* Fed. R. App. P. 28(a)(5), nor is it addressed in any depth in the argument sections of his brief. Rather, Reed's brief notes only that "[t]he failure to train claim was tied into the failure to promote claim" and states, without further elaboration, that Reed's "deposition testimony and declaration" show that "he was not trained properly as Caucasians." Reed's brief refers to some facts pertinent to a failure-to-train claim but engages in no legal analysis of either the burden-shifting or mixed-motive framework. Therefore, Reed has waived this issue. *See Popovich v. Cuyhoga Cnty Court of Common Pleas*, 276 F.3d 808, 823 (6th Cir. 2002) (en banc) ("Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to put flesh on its bones.") (alterations in original omitted) (citation omitted)); *see also Shqutaj v. Gonzales*, 158 F. App'x. 663, 665–66 (6th Cir. 2005) ("Where the petitioner's brief lacks legal or factual argument, this Court will not examine the record and construct an argument on petitioner's behalf.").

We accordingly affirm the grant of summary judgment on all of Reed's disparate treatment claims.

**D. Retaliation**

Reed next alleges that P&G's management retaliated against him for participating in Reginald Charles's internal complaint of racial discrimination at the plant, and for making his own complaints to the human resources department. Reed appears to contend that both his removal from his extended role and his failure to attain T4 status were retaliatory. In order to

establish a prima facie case of retaliation, Reed must show that (1) he engaged in protected conduct, (2) P&G had knowledge of his protected activity, (3) P&G took an adverse employment action against him, and (4) a causal connection exists between the protected activity and the adverse employment action. *See Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321, 345 (6th Cir. 2008).

Drawing all reasonable inferences in his favor, Reed engaged in protected activity when he made oral complaints of discrimination to King and Napadek, see *Trujillo v. Henniges Auto. Sealing Sys. N. Amer., Inc.*, 495 F. App'x 651, 655 (6th Cir. 2012), and when he participated in Charles's internal investigation, *see Crawford v. Metro. Gov't of Nashville and Davidson Cnty., Tenn.*, 555 U.S. 271, 277–80 (2009). However, it is less clear whether Reed engaged in a protected activity when he sent King his letter dated October 5, 2008, complaining that the promotional process was unfair. Although the letter does name two White employees seeking T4 status, and uses the word "discriminatory," it does not directly state that Reed believed he was being discriminated against on the basis of his race or that he suspected that White employees were receiving opportunities that he was not. *See Fox v. Eagle Distrib. Co.*, 510 F.3d 587, 591 (6th Cir. 2007) ("[A] vague charge of discrimination in an internal letter or memorandum is insufficient to constitute opposition to an unlawful employment practice") (citation omitted)); *see also Willoughby v. Allstate Ins. Co.*, 104 F. App'x 528, 531 (6th Cir. 2004).

We need not resolve this issue, though, because Reed's retaliation claim fails for other reasons. The second and fourth elements for a prima facie case of retaliation require that the employer knew of the plaintiff's protected activity and that the protected activity and the adverse employment action be causally linked. When understood in conjunction, then, these two

elements require a plaintiff to show that the relevant decision-makers were aware of his or her protected activity. See *Mulhall v. Ashcroft*, 287 F.3d 543, 552–53 (6th Cir. 2002). While a plaintiff can point to circumstantial evidence of such knowledge, he or she must produce "specific facts," not mere "conspiratorial theories." *Id.*

As for the first alleged adverse employment action, Reed's removal from his extended role position, Reed does not contest that Napadek made the decision to eliminate some extended roles in the summer of 2008, and that Bruns chose the particular positions that October. Reed has not set forth specific facts to demonstrate that either Napadek or Bruns were aware of Reed's complaints of racial discrimination during the relevant time period. Rather, all that can be discerned from the record is that Reed gave a letter to, and then spoke with, King in October, and that Reed and Napadek met and discussed Reed's concerns about discrimination in November, after his role had been selected for elimination. Likewise, the record does not permit us to conclude that the individuals with the authority to promote Reed—again, Bruns, and arguably Massey, who coached his team members through the promotion process—knew that he had spoken up about discrimination. While Reed testified at his deposition that he spoke with Bruns about Massey's hostile or harassing behavior, he also admitted that he did not tell Bruns that he believed Massey was discriminating against him due to his race. And, lastly, the record provides no details as to the content of Reginald Charles's complaints, when they were made, or who participated in or was aware of the investigation. Because Reed cannot establish a causal connection between the adverse employment actions and his protected activities, the district court properly granted summary judgment on his retaliation claim.[1]

---

[1]We also note that it is questionable whether Reed's removal from his extended role position is the sort of adverse employment action needed to support a claim of retaliation. *See Kocsis v. Multi-Care Mgmt, Inc.*, 97 F.3d 876, 885–86 (6th Cir. 1996) (finding no "materially adverse

### E. Hostile Work Environment

Lastly, Reed alleges that he was subjected to a hostile work environment created by Massey and other, largely unidentified, colleagues. Title VII protects employees from having to work in a "discriminatorily hostile or abusive environment." *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993). "To succeed on a claim of racially hostile work environment," Reed must show the following: (1) that he "belonged to a protected group," (2), that he "was subject to unwelcome harassment," (3) that "the harassment was based on race," and (4) was "sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment," and (5) that P&G "knew or should have known about the harassment and failed to act." *Williams v. CSX Trans. Co.*, 643 F.3d 502, 511 (6th Cir. 2011).

We focus on the third and fourth elements, considering whether Reed can establish that he suffered harassment "based on race." *Id.* A plaintiff can show that harassment was based on race by either putting forth "direct evidence of the use of race-specific and derogatory terms," or by showing that the harassing party treated employees not in the plaintiff's protected class differently—that is to say, better. *Id.* To determine whether harassment was sufficiently severe or pervasive, we look at the combined effect of all alleged acts of harassment. *See id.*

To support his claim that P&G fostered a racially hostile work environment, Reed points to the following incidents: Reed received a "threaten[ing]" email and a "hostile" phone call from Massey; Reed believed that Massey created a noose from a telephone cord when Reed was nearby but unable to see Massey's gesture; Reed heard colleagues use racial slurs in the workplace; Reed was excluded from lunches with colleagues and treated in a cold manner by his

employment action" where plaintiff continued to receive same pay, continued to perform same duties, and experienced no loss of prestige in new position). We do not need to resolve this matter due to the other faults in Reed's retaliation claim.

managers after expressing his concerns about the promotion process; and a colleague at one point splashed Reed's "head and face . . .with an unknown solution."

Beginning with the incidents involving Massey, Reed testified that he and Massey had exchanged emails that Reed interpreted as "hostile" and "threatening," and that Massey became "belligerent" when Reed asked for a vacation day that Massey had already given off to another (also African-American) employee. Reed ultimately took the day off. As for the email, Reed's only specific example of a hostile statement is that Massey told him to "cut the crap." Reed has not presented any evidence suggesting that Massey's annoyance or anger on these occasions was indicative of discrimination. No racial animus is apparent from Massey's words or actions, and Reed has not pointed to facts that would allow us, or a jury, to conclude that Massey did not treat White employees similarly. Because Reed has not shown that any harassment occurring over the phone or via email was because of his race, we do not consider these incidents in assessing the overall severity or pervasiveness of harassment in the workplace. *Williams*, 643 F.3d at 511 (citing *Bowman v. Shawnee State Univ.*, 220 F.3d 456, 464 (6th Cir. 2000)).

However, Reed also raises a far more serious allegation regarding Massey. In his deposition, Reed testified that he was sitting at his desk one day as Massey walked in, approached his own desk (located adjacent to Reed's), took a telephone cord out of a drawer, and then walked behind Reed. At this point—while Massey was out of Reed's field of vision—Reed heard another co-worker laugh and ask Massey, "Are you fixing to hang someone?" Reed testified that he then heard the cord fall into a trash can to his left. He explained that his "immediate reaction was that possibly a noose had been formed out of the cord or some type of gesture" had been made to indicate a hanging. Although Reed never saw Massey form a noose, we are required to draw all inferences in Reed's favor, and we conclude what Reed did observe

and hear could allow fact-finders to determine that Massey made an extremely offensive, racially charged gesture in Reed's presence.

Reed further alleges that he heard one particular White co-worker in the hot oil department make a comment to another White employee about eating "watermelon and fried chicken," and that he later observed the same individuals "joking about the watermelon again." These terms may indeed be racially charged, and if we draw all inferences in Reed's favor, we could determine that a jury might find them to have been directed at Reed. Accordingly, we find that Reed has met the third requirement.

As for Reed's remaining allegations, these fail to meet the requirement that the harassing behavior be because of Reed's race. The record is devoid of evidence to indicate that Reed was splashed with an unknown liquid, or that he was subject of unfriendly treatment from some colleagues, because he is African-American; nor does Reed provide sufficient evidence that Black employees were generally treated differently than White employees, other than his arguments pertaining to his failure to attain a promotion.

Thus, we are left with the telephone cord episode and the references to fried chicken and watermelon, and must determine whether the combined effect of these incidents could constitute harassment "sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment." *Williams*, 643 F.3d at 511. In making this determination, we consider "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23; *see also Williams*, 643 F.3d at 512–13. Reed alleges only three instances of harassing behavior, although he had been working at the plant since 1996. Two of those instances—his coworkers' comments—were offensive but

not particularly serious or threatening; rather, they fall into the "offensive utterance" category. *See Harris*, 510 U.S. at 23. And while the telephone cord incident is much more troubling, we note that it is isolated—Reed does not allege that Massey made any other offensive gestures or comments—and that Massey did not directly accost or threaten Reed.[2] Thus, even drawing all inferences in Reed's favor, the conduct Reed alleges is not sufficiently severe or pervasive to support his claim that P&G fostered a hostile work environment. *Cf. Williams*, 643 F.3d at 512–13; *Burnett v. Tyco Corp.*, 203 F.3d 980, 981, 985 (6th Cir. 2000) (three offensive incidents, one involving touching and two involving explicit comments, found insufficient to establish hostile work environment on the basis of sex); *E.E.O.C. v. Northwest Airlines, Inc.*, 188 F.3d 695, 702 (6th Cir. 1999) (repeated incidents involving "presence of nooses and Ku Klux Klan symbols in the workplace" found sufficient to warrant "general injunctive relief" pursuant to consent decree prohibiting employer from engaging in or allowing racial harassment of employees). Because Reed cannot meet the fourth requirement to show a hostile work environment, we need not consider whether P&G knew or should have known of the offensive incidents and failed to respond. The district court properly dismissed this claim.

### III. CONCLUSION

We affirm the district court's grant of summary judgment in P&G's favor on Reed's state-law and federal claims of disparate treatment, retaliation, and hostile work environment.

---

[2]We do not exclude the possibility that only one or two incidents of race-based harassment may be so severe as to constitute a hostile work environment. *See Ayissi-Etoh v. Fannie Mae*, 712 F.3d 572, 575, 577 (D.C. Cir. 2013) (reversing grant of summary judgment on hostile work environment claim where supervisor yelled at African-American employee, "Get out of my office, nigger"). But the facts Reed alleges are not sufficiently severe.