Gary W. WOODS and Nicholas
E. Lorenzo, Plaintiffs–
Appellants,

v.

FACILITYSOURCE, LLC; Duane E.
Smith; Jordan Walker; and William
Hayden, Defendants–Appellees.

No. 15–3138.

United States Court of Appeals,
Sixth Circuit.

Feb. 3, 2016.

BEFORE: MERRITT, DAUGHTREY, and GRIFFIN, Circuit Judges.

MARTHA CRAIG DAUGHTREY, Circuit Judge.

Plaintiffs Gary Woods and Nicolas Lorenzo appeal the district court's grant of summary judgment to defendants Facility-Source, LLC, Duane Smith, Jordan Wagner, and William Hayden on the plaintiffs' claims of racial discrimination and hostile work environment brought pursuant to the provisions of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e–2000e–17, 42 U.S.C. § 1981, and the anti-discrimination provisions of §§ 4112.02 and 4111.17 of the Ohio Re-vised Code. Woods, an African–American male, alleged specifically that, due to his race, the defendants offered him lower wages, failed to promote him, impeded his opportunities for advancement, and created a hostile work environment. Lorenzo, a Caucasian male, alleged that, because he was Woods's domestic partner, the racist attitudes of the defendants also resulted in him being paid lower wages, not being promoted, and not being given the support he needed to advance within the company. Additionally, the Equal Employment Opportunity Commission (EEOC), as *amicus curiae*, asserts on appeal that the district court erred in "holding that whether a submission [to the EEOC] constitutes a charge turns, in part, on whether the EEOC treated the submission as a charge and notified the employer."

On appeal, we conclude that the district court properly granted summary judgment to the defendants on the plaintiffs' claims of discrimination. We also conclude, however, that the district court improperly augmented the standard for determining whether a submission to the EEOC constitutes a charge of discrimination. Because any error in this regard does not affect the outcome of the appeal, we affirm the judgment of the district court.

## FACTUAL AND PROCEDURAL BACKGROUND

Defendant FacilitySource is an Ohio-based company that provides and manages vendors who, in turn, offer maintenance services for "big box retailers, department stores, quick service restaurants, mall-based specialty retailers, and other companies with multiple locations." The company began operations in 2005 and, in September of that year, hired Gary Woods as a customer-service representative at a salary of $10.00 per hour, or approximately

$20,800 per year. Over time, Woods rose through the ranks at the company, serving next as a quality manager, then as a call center manager, and finally as an account manager. By April 2011, and through the remainder of Woods's employment at FacilitySource, he received an annual salary of $42,200.69.

In October 2005, Nicolas Lorenzo, Woods's domestic partner, also applied for a position at FacilitySource but requested a starting salary of $11.00 per hour, or approximately $22,880 per year. After being hired at that level, Lorenzo, too, progressed up the company ladder over the years and, by the end of 2013, was being paid $42,700.32 per year as an account manager.

Although defendant William Hayden, the president and chief executive officer of FacilitySource, was responsible for the approval of Woods's and Lorenzo's promotions to the position of account manager, the plaintiffs contend that their upward mobility in the company ceased and their salaries stagnated in comparison with the salaries of new account managers as a result of Hayden's actions, including his hiring of defendant Jordan Wagner as the company's Market Director–Retail in July 2009 and defendant Duane Smith as Vice-President for Client Services in July 2010. According to Hayden, however, the fact that the plaintiffs' salaries were lower than the salaries of other account managers was due to the need for FacilitySource "to become more competitive in the market" after 2010 and, thus, to recruit "more seasoned employees" and "hire Account Managers at a higher rate than previous Account Managers were being paid."

To that end, the qualifications to be hired as an account manager after 2010 were changed to require applicants to have earned, at a minimum, a two-year degree from a college or university or to have gained "previous account management experience in . . . facility maintenance." The posting for account manager positions stated explicitly, however, that the position "is a non-sales role." Even though plaintiff Woods acknowledged that the qualifications for the job had been increased, making it appropriate for FacilitySource to increase the starting salaries for the positions, he and Lorenzo felt that their compensation packages should have been increased commensurately because they were the second and third most-tenured employees at FacilitySource.

Nor was the differential between the plaintiffs' salaries and the salaries of other account managers the only perceived inequity identified by the plaintiffs at their place of employment. Woods and Lorenzo also felt that they had not been promoted to positions as senior account managers— as were some individuals hired after them—because of Woods's race and because of Lorenzo's association with Woods. Furthermore, they asserted that, due to race or association, they were denied merit raises, they were isolated and treated differently than other employees, and Woods was subjected to offensive, racially tinged comments and actions by defendants Smith and Wagner.

In June 2012, Woods emailed Brent Myers, FacilitySource's director of human resources, stating his intention "to file a formal complaint of discrimination against" the company due to the unequal treatment Woods felt he had endured. When Woods did not receive the company response for which he had hoped, he and Lorenzo filed, in letter form, so-called "formal charge[s] of discrimination" with the EEOC and the Ohio Civil Rights Commission, alleging racial discrimination, creation of a hostile work environment, and racial discrimination based upon association. Both letters included declarations made "under penalty

of perjury" and detailed the actions underlying the claims. The plaintiffs also completed EEOC "intake questionnaires," but never signed and dated official charge-of-discrimination forms. Ultimately, the plaintiffs requested and received right-to-sue letters from the EEOC and, on June 28, 2013, filed a complaint in the federal court alleging racial and associational discrimination, creation of a hostile work environment, violations of 42 U.S.C. § 1981, and violations of sections 4112.02 and 4111.17 of the Ohio Revised Code.

A period of discovery ensued, during which time FacilitySource learned that Woods had provided false statements on his job application with the company. Specifically, Woods had claimed that he had graduated from high school—a minimum requirement for employment at FacilitySource—and that he had left his previous job due to a reduction in work hours. In reality, Woods never graduated from high school, earning only 14.5 of the 29 credits needed for graduation. In addition, Woods did not leave his prior job voluntarily but, instead, was terminated for making misstatements on his application for that job as well. As a result of the falsehoods contained on the FacilitySource application, the company fired Woods effective March 31, 2014.

In light of Woods's false statements in his application, FacilitySource filed a counterclaim against him, asserting that Woods fraudulently induced the company to enter into a contract of employment with him. As a remedy, FacilitySource sought rescission of the contract, nominal or compensatory damages, punitive damages, and reasonable attorneys' fees, costs, and expenses. The parties sought summary judgment on both the initial claims of discrimination and on the counterclaim for rescission and damages.

In an extensive and thorough written opinion, the district judge granted summary judgment to the defendants on all claims asserted by Woods and Lorenzo. In doing so, the district court first determined that the plaintiffs effectively exhausted their administrative remedies because the plaintiffs' administrative claims gave fair notice of their content to the employer and because "the EEOC treated the plaintiffs' submissions as charges of discrimination." Turning to the substance of the claims, the district court concluded that the defendants offered legitimate, nondiscriminatory reasons for the wage differentials at issue and that the plaintiffs failed to adduce evidence indicating that the proffered explanations were pretexts for invidious discrimination. Likewise, the district court determined that the plaintiffs did not establish the requisite elements of their claims of failure to promote, failure to receive a raise, demotion in job responsibilities, isolation, and hostile work environment.

Having succeeded on their summary judgment motions, the defendants requested that the district court dismiss their counterclaim against Woods and Lorenzo without prejudice, a motion that the district judge granted. With no additional matters properly before it, the district court entered judgment in favor of the defendants, from which the plaintiffs now appeal.

## DISCUSSION

We review *de novo* the grant of summary judgment by a district court. *See Dodd v. Donahoe*, 715 F.3d 151, 155 (6th Cir.2013). Summary judgment will be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). A genuine dispute of material fact exists only

when, assuming the truth of the non-moving party's evidence and construing all inferences from that evidence in the light most favorable to the non-moving party, there is sufficient evidence for a trier of fact to find for that party. *See Ciminillo v. Streicher,* 434 F.3d 461, 464 (6th Cir. 2006). A non-moving party cannot withstand summary judgment, however, by introduction of a "mere scintilla" of evidence in its favor. *Id.*

### Administrative Exhaustion of Claims of Discrimination

■ The EEOC has filed an *amicus curiae* brief with this court, arguing that the district court properly held that the plaintiffs had exhausted their administrative remedies before filing suit but failed to apply the appropriate test to determine when a submission to the EEOC constitutes a charge of discrimination. Responding to an assertion by the defendants that the prerequisites for filing a federal lawsuit had not been met by the plaintiffs, the district court noted:

> Woods and Lorenzo both signed and filed intake questionnaires with the EEOC in March 2013. The completed questionnaires described the basis of the alleged discrimination and alleged that Smith and Wagner were the individuals responsible. Accompanying the questionnaires were signed, verified letters (declaring under penalty of perjury that the letters were true and correct), providing more details of the alleged discrimination, identifying plaintiffs' legal counsel, and requesting that the EEOC treat the questionnaires and letters as charges of discrimination.

The district court then continued its exhaustion analysis by recognizing that the submissions by the plaintiffs adequately informed the defendants of the charges and noted, gratuitously, that "the EEOC treated the plaintiffs' submissions as charges of discrimination."

As now contended by the EEOC, however, whether the agency in fact "treated the plaintiffs' submissions as charges of discrimination" is legally irrelevant. In *Federal Express Corp. v. Holowecki,* 552 U.S. 389, 402, 128 S.Ct. 1147, 170 L.Ed.2d 10 (2008), a case involving a charge of discrimination under the Age Discrimination in Employment Act (ADEA), 29 U.S.C. §§ 621–34, the Supreme Court explained that a submission to the EEOC will be considered a "charge" if it satisfies all statutory and regulatory requirements of such a filing and can "be reasonably construed as a request for the agency to take remedial action to protect the employee's rights," regardless of whether the agency treats it as such.

Moreover, in *Williams v. CSX Transportation Co., Inc.,* 643 F.3d 502, 508 n. 2 (6th Cir.2011), we took notice of the myriad similarities between the ADEA and Title VII and held that *Holowecki* 's analysis is applicable to Title VII exhaustion analyses in the same manner that it applies in an ADEA context. Consequently, as the EEOC correctly states, that portion of the district court's opinion that recognized that the agency did, in fact, treat the plaintiffs' submissions as charges must be read as dicta or mere surplusage and cannot be understood to restrict the concept of a "charge" of discrimination more than the Supreme Court has deemed appropriate. We therefore concur in the district court's ultimate conclusion that the plaintiffs effectively exhausted their administrative remedies, but we explicitly disapprove language in the district court's opinion that could be construed to impose requirements upon a Title VII filer more restrictive than those set forth in *Holowecki.*

### Anti–Discrimination Statutes

In pertinent part, Title VII makes it unlawful for an employer "to discriminate

against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race...." 42 U.S.C. § 2000e–2(a)(1). Title VII also "forbids discrimination on the basis of association with or advocacy for a protected party." *Barrett v. Whirlpool Corp.*, 556 F.3d 502, 511 (6th Cir.2009). Ohio's comparable anti-discrimination statute, Ohio Rev.Code § 4112.02(A), similarly provides that it shall be unlawful "[f]or any employer, because of the race ... of any person, to ... discriminate against that person with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment." In fact, "federal case law applying Title VII is generally applicable to cases involving § 4112 of the Ohio Civil Rights Act." *Birch v. Cuyahoga Cty. Prob. Court*, 392 F.3d 151, 163 (6th Cir.2004). Moreover, Title VII analysis also provides the framework for reviewing discrimination claims brought pursuant to 42 U.S.C. § 1981.[1] *Barrett*, 556 F.3d at 512. Claims of wage discrimination, whether brought pursuant to Title VII or Ohio Revised Code § 4111.17, are analyzed as if the claims were brought under the federal Equal Pay Act, 29 U.S.C. § 206(d)(1). *Birch*, 392 F.3d at 161; *Odomes v. Nucare, Inc.*, 653 F.2d 246, 250 (6th Cir.1981).

### Equal Pay Act/Title VII Claim: Wage Discrimination

To establish a *prima facie* case of wage discrimination under the Equal Pay Act and, by analysis, under Title VII, the plaintiffs must show that they were paid lower wages than employees outside the protected class "for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions." 29 U.S.C. § 206(d)(1); *Warf v. U.S. Dep't of Veterans Affairs*, 713 F.3d 874, 881 (6th Cir.2013) (quoting *Corning Glass Works v. Brennan*, 417 U.S. 188, 195, 94 S.Ct. 2223, 41 L.Ed.2d 1 (1974)). In this case, the defendants do not contest that Woods and Lorenzo established such *prima facie* cases of wage discrimination. In fact, defendant Smith readily admitted in discovery documents that both Woods and Lorenzo are "paid less than some other Account Managers." Instead, the defendants rely upon one of the four statutory defenses listed in the relevant federal and the Ohio statutes in an effort to defeat the plaintiffs' claims.

The Equal Pay Act provides that employers may justify payment of lower wages to certain employees as long as those payments are made pursuant to "(i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than [the protected classification]." 29 U.S.C. § 206(d)(1).[2] In the district court, the defendants sought to legitimize any pay differentials by claiming that the inconsistencies were based on factors other than race, "specifically, that the Account

---

**1.** Section 1981 guarantees to all persons "the same right ... to make and enforce contracts ... as is enjoyed by white citizens." "Section 1981 also prohibits discrimination based on association with or advocacy for non-whites...." *Barrett*, 556 F.3d at 512.

**2.** Section 4111.17(B) of the Ohio Revised Code employs nearly identical language when listing the defenses available to employers except that the Ohio statutory scheme spells out more inclusively the fourth defense, which allows a defendant to justify its actions by proof of "[a] wage rate differential determined by any factor other than race, color, religion, sex, age, national origin, or ancestry." Ohio Rev.Code § 4111.17(B)(4).

Managers who earned more were better qualified than [the plaintiffs]." However, in its opinion granting summary judgment to the defendants, the district court stated that the defendants "argue that the wage differential between plaintiffs and other account managers is based on a merit system of pay." Before this court, the defendants contend that the evidence in the record "satisfies both affirmative defenses."

██ The defendants properly and candidly admit that a number of account managers at FacilitySource had higher annual salaries than plaintiffs Woods and Lorenzo. In fact, a chart in an exhibit that was classified as confidential during depositions because of its inclusion of names, salaries, and other information concerning non-parties to this litigation shows that of the 26[3] account managers (including Woods and Lorenzo) who were hired by FacilitySource between 2005 and June 2013, 24 identified as Caucasian, and only one was hired before the plaintiffs. Twelve of those 26 account managers were hired after January 2010–the time at which the defendants claimed they were forced to increase starting salaries to entice more qualified individuals to cast their lot with the company. Of those 12 more recent hires, all but one earned a higher salary than either plaintiff, and the one account manager hired in March 2010 who earned less than the plaintiffs had a listed salary only $184 per year lower than Woods's. The rest of the newer hires earned between $46,710.56 and $60,840.00–salaries significantly higher than those of the plaintiffs. The defendants again explain that salary discrepancy by referencing the fact that hiring qualifications were stricter starting in 2010. According to the company's own job posting for the account man-

ager position, new hires were required to possess the following qualifications (as copied verbatim from the posting, without corrections):

Minimum of 2 year degree or previous account management experience in the facility maintenance. This is a non-sales role.

Proficient with MS Office especially Excel.

Knowledge of the facility maintenance.

2–3 of practical work experience in facility maintenance of skilled trades.

Demonstrated sense of urgency and follow through.

Ability to communicate clearly with customer and vendors through conversation and writing.

Given the more stringent qualifications for the account manager position, it is understandable that post–2010 starting salaries would be higher than those of individuals hired prior to implementation of the new hiring guidelines. In fact, Woods himself admitted during his deposition that "[i]t would be appropriate" for FacilitySource to increase the starting salaries of its account managers "due to the increase in the qualifications."

Despite that concession, plaintiff Woods still argues that his salary and the salary of plaintiff Lorenzo should have been increased commensurately because of the plaintiffs' seniority with the company. However, Woods's belief that seniority should have been given equal or greater weight than educational and experiential accomplishments does not mean that the defendants were guilty of wage discrimination simply because they viewed other criteria as more germane to their salary-determination decision.

---

**3.** A twenty-seventh account manager was listed on the chart, but FacilitySource was un-

able to provide any salary information about that person.

■ Similarly, legitimate, nondiscriminatory reasons were offered to explain why other account managers hired *prior to* 2010 received higher salaries than Woods and/or Lorenzo. For example, Josh Holecko, hired by FacilitySource in 2007, had graduated from Youngstown State University with a degree in marketing. Additionally, Holecko could claim five years of sales experience before joining Facility-Source, including expertise in "account management, territory management, sales training[,] and market analysis." Likewise, Stephen Zerucha, another 2007 hire, although not a college graduate, had taken college business courses at both Columbia University in New York City and Ohio State University in Columbus. Moreover, prior to working at FacilitySource, Zerucha had served as a general manager for three other companies and had been an operating partner of another business for six years, during which time he not only trained managers but also provided accounting and auditing services for the organization. Thus, at the time Facility-Source hired Holecko and Zerucha, the plaintiffs had been employees of the company for only two years and had résumés that could not match the educational backgrounds and experiences of their later-hired colleagues.

In an attempt to challenge the legitimacy of FacilitySource's explanation for offering higher salaries to account managers other than Woods and Lorenzo, plaintiff Lorenzo points out that he too had a college degree at the time of his hiring at FacilitySource, yet he did not receive the higher salaries that some other employees did. The record before the court does indicate that Lorenzo graduated from Ohio University. However, Lorenzo earned a Bachelor of Fine Arts degree after completing his coursework in printmaking. Clearly, skills gained from such a degree were not as immediately transferable to Lorenzo's job at FacilitySource as were those from the degrees obtained and courses taken by other individuals in management and business-related subjects.

Nor does the fact that Caucasian employee David Sigmund received a higher salary than the plaintiffs as an account manager establish the wage discrimination that the plaintiffs seek to prove. Like Woods and unlike Lorenzo, Sigmund did not possess a college degree, although he did spend time at Ohio State University studying communications. Like both plaintiffs, his pre-FacilitySource employment involved little significant managerial training, although Sigmund claimed that he spent two years as a shift supervisor at a chain restaurant, a position that entailed training responsibilities and "minor managerial obligations." Sigmund was hired by FacilitySource in October 2007, two years after the plaintiffs, and advanced through the company until he was promoted to the position of account manager at an annual salary of $43,004.00, or $303.68 per year more than Lorenzo and $803.40 more per year than Woods. Given the fact that Sigmund had some college education that Woods did not—as it turned out, Woods had never even graduated from high school—and given the fact that Sigmund's college concentration in communication could be viewed as more relevant to the work of an account manager than Lorenzo's printmaking studies, and given the fact that Sigmund possessed some prior managerial expertise that neither Woods nor Lorenzo had gained prior to their employment with FacilitySource, the qualifications of the three employees were different enough to justify the relatively minor differences in the annual salaries of Sigmund, Woods, and Lorenzo.

The plaintiffs have failed to identify a genuine dispute of fact regarding the claimed differences in qualifications and

experiences that resulted in the pay differentials among account managers at FacilitySource. Consequently, the district court did not err in granting summary judgment to the defendants on the claims of wage discrimination brought by the plaintiffs.

### Title VII Claims: Discrimination in Promotions, Raises, and Job Responsibilities

The plaintiffs also raise more traditional Title VII disparate-treatment claims, alleging that Woods's race and Lorenzo's association with Woods were the determining factors in the defendants' decisions not to promote the plaintiffs to positions as senior account managers, not to offer the plaintiffs pay raises, and to remove job responsibilities from plaintiff Woods. Similar analytical frameworks are used to evaluate each of the plaintiffs' assertions.

Title VII claims of racial discrimination may be proven either by direct evidence or by circumstantial evidence. *Johnson v. Kroger Co.*, 319 F.3d 858, 864–65 (6th Cir.2003) (citation omitted). The plaintiffs offer no direct evidence of racial discrimination on the part of the defendants. Consequently, relying upon circumstantial evidence of discrimination, they employ the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and refined in *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). Under that paradigm, the plaintiffs first must establish a *prima facie* case of discrimination. *Burdine*, 450 U.S. at 252–53, 101 S.Ct. 1089 (citing *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. 1817). If the plaintiffs do so, the burden of production shifts to the defendants to "articulate some legitimate, nondiscriminatory reason for the [alleged adverse action]." *Id.* (quoting *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. 1817).

The plaintiffs then are required to prove that the reasons proffered by the defendants were not their true motivations for their actions, but were mere pretexts for prohibited discrimination. *Id.* (citing *McDonnell Douglas*, 411 U.S. at 804, 93 S.Ct. 1817). We have held consistently that a plaintiff's burden of establishing a *prima facie* case is not an onerous one, *see, e.g., Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 660 (6th Cir.2000) (citing *Burdine*, 450 U.S. at 253, 101 S.Ct. 1089), and is "a burden easily met." *Wrenn v. Gould*, 808 F.2d 493, 500 (6th Cir.1987) (citations omitted).

### Failure to Promote

In order to establish a *prima facie* case of failure to promote, a plaintiff must prove that:

> (1) [he or] she is a member of a protected class; (2) [he or] she applied for and was qualified for a promotion; (3) [he or] she was considered for and denied the promotion; and (4) other employees of similar qualifications who were not members of the protected class received promotions at the same time [his or] her request for promotion was denied.

*Warf*, 713 F.3d at 879. Thus, at first blush, it would seem that neither Woods nor Lorenzo can meet their less-than-onerous *prima-facie*-case burdens on their failure-to-promote claims because neither plaintiff actually applied for the promotions they claim they should have received. As this court has held, however:

> [I]n failure to promote cases a plaintiff does not have to establish that he applied for and was considered for the promotion when the employer does not notify its employees of the available promotion or does not provide a formal mechanism for expressing interest in the promotion. Instead, the company is held to a duty to consider all those who

might reasonably be interested in a promotion were its availability made generally known.

*Dews v. A.B. Dick Co.,* 231 F.3d 1016, 1022 (6th Cir.2000).

█ Both plaintiffs seek to take advantage of this exception to the requirement of establishing the usual elements of a *prima facie* case. In fact, not only did Lorenzo claim during his deposition testimony that he never was made aware of the opportunity to apply for the two promotions for which he felt he was qualified, but also both he and Woods declared in sworn affidavits that they "expressed interest in obtaining a raise and promotion with FacilitySource while employed there, but none were provided despite [their] seniority and performance."

The record is clear that plaintiff Woods was indeed promoted numerous times while employed at FacilitySource. He asserts, nevertheless, that "[a]fter Duane Smith was hired by FacilitySource and Jordan Wagner was promoted from Account Manager, [he] did not receive another promotion." Furthermore, although he swore in an affidavit that he had, in fact, "seen one posting for the position of Senior Account Manager since [he] became an Account Manager," Woods claimed that defendant Smith "discouraged [him] from applying for that position, essentially saying it was not worth [Woods's] time, and also implied that [Smith] already knew who would fill that spot." He thus argues that only racial discrimination could account for the fact that he was not promoted to the position of senior account manager.

According to defendant Hayden, however, the senior-account-manager position requires, at a minimum, that the applicant have obtained a bachelor's degree, "preferably in Business or [a] related field," and that the applicant have accumulated "2–3+ years [of] previous account management experience." Clearly, plaintiff Woods could not meet the first of those qualifications, given the fact that he had not graduated from high school. Nevertheless, he contends that at some point during his tenure at FacilitySource he was qualified to be a senior account manager. In support of that assertion, he points to a July 2009 document entitled "Sr. Account Manager" that nowhere mentions the requirement that an applicant for the position have received a college degree. An examination of that exhibit, however, reveals that it purports to detail only the duties and responsibilities of a senior account manager, not the qualifications for the position.

In a further attempt to establish his suitability for the advanced position, Woods argues that two other FacilitySource employees, Stacy Spilman and Jeff Moore, became senior account managers without having obtained bachelor's degrees. Woods has failed, however, to adduce any evidence that the two supposed comparators did not have the required credentials. Instead, Woods relies solely upon supposition and conjecture to support his position. For instance, despite the fact that defendant Hayden swore in a declaration under penalty of perjury that Moore "has a Bachelor of Science degree in business administration with a specialization in marketing," Woods asserts that Moore's 2005 application should be considered determinative of the extent of Moore's credentials. In that application, Moore reported that he had, at that time, completed four years of college at Ohio State University but had not yet received his degree. Given that Hayden confirmed in October 2014 that Moore did indeed have a bachelor of science degree, it is only logical to assume that sometime within the nine-year span between the time Moore initially ap-

plied for his job and the time Hayden prepared his declaration, Moore completed the additional necessary coursework to complete his degree requirements. The plaintiffs offer no evidence to the contrary.

Similarly, Woods and Lorenzo can point to no *evidence* that Spilman did not possess a bachelor's degree at the time she was promoted to the position of senior account manager. In fact, the only evidence in the record at all regarding Spilman's educational credentials is Woods's unsubstantiated assertion in his deposition that Spilman's LinkedIn account does not mention her possession of such a degree. Obviously, Woods's claim that he looked at Spilman's LinkedIn account and did not find reference to her earning a bachelor's degree does not constitute the evidence necessary to raise the plaintiffs' claim in this regard above the level of an unsupported allegation. Because Woods is not able to establish either that he possessed the necessary qualifications to become a senior account manager or that other individuals without those qualifications nevertheless were promoted when he was not, the district court did not err in granting summary judgment to the defendants on Woods's failure-to-promote claim.

Plaintiff Lorenzo claimed in the district court that, as a result of associational discrimination, he was bypassed for a promotion to the position of senior account manager on two occasions—once when Katie Kinzig was promoted to senior account manager and, again, when Bill Esposito replaced Kinzig after she left Facility-Source for a position with another company. Lorenzo asserts that he had equal or superior qualifications to Kinzig and Esposito because he had earned a college degree and, at the time of Kinzig's promotion, he had accumulated five years' experience with FacilitySource.

Despite Lorenzo's unsupported assertions to the contrary, the record contains no documentary evidence that Kinzig ever served as a senior account manager at FacilitySource. In fact, Bill Hayden, again under penalty of perjury, declared that "Kathleen Kinzig, a Caucasian, was never promoted to the position of Senior Account Manager. She began and ended her [one-year] career at FacilitySource as an Account Manager." Moreover, the district court did not err in concluding that Lorenzo failed to establish that his qualifications to be a senior account manager were similar to those of Esposito. Lorenzo had earned a bachelor's degree, but as previously noted, that degree was a BFA in printmaking. In contrast, Esposito had earned a Bachelor of Science degree and had "five years' experience in sales." Meanwhile, Lorenzo had been told by his supervisor that he had not put in sufficient "face time" with his clients. Even though Lorenzo disputes his alleged lack of "face time" with clients, Esposito's educational background clearly was more relevant to the day-to-day operations of the company and could justifiably be viewed as superior to Lorenzo's qualifications for the job.

Consequently, neither Woods nor Lorenzo was able to adduce any evidence establishing that they possessed qualifications similar to those of the people identified by them as being promoted at their expense. The district court thus did not err in granting summary judgment to the defendants on the plaintiffs' failure-to-promote claims.

### Failure to Receive Merit Raises and Demotion in Job Responsibilities

The plaintiffs assert that the defendants also discriminated against them by denying them merit raises and in demoting Woods by reducing his job responsibilities.

As part of the *McDonnell Douglas–Burdine* burden-shifting analysis applicable to this claim, the plaintiffs first must establish a *prima facie* case of race discrimination by showing that:

> 1) [they are] member[s] of a protected class; 2) [they were] qualified for the job and performed it satisfactorily; 3) despite [their] qualifications and performance, [they] suffered an adverse employment action; and 4) [they were] replaced by a person outside the protected class or was treated less favorably than a similarly situated individual outside of [their] protected class.

*Laster v. City of Kalamazoo*, 746 F.3d 714, 727 (6th Cir.2014) (footnote and citation omitted).

The plaintiffs cannot satisfy even the less-than-onerous burden imposed by this *prima facie* case framework for these claims. First, although the plaintiffs contend that they did not receive merit raises, documentary evidence in the record establishes that "[b]oth Gary Woods and Nicolas Lorenzo received merit raises on June 2, 2012," and that "Lorenzo again received a merit raise on May 12, 2014," six weeks after Woods had been terminated from his position with FacilitySource. Furthermore, according to the company's human resources manager, "[t]here were no companywide merit raises in 2013." In short, the plaintiffs have offered no evidence that they were discriminated against in the allocation of merit raises. Their assertion that other account managers received merit raises when they were promoted to other positions misapprehends the distinction between merit raises and promotions and does not provide any evidence of adverse employment actions germane to this claim. The district court did not err in concluding that the plaintiffs failed to identify a genuine dispute of fact regarding the alleged denial of merit raises.

Likewise, the record before this court does not support Woods's contention that he was demoted from his position as an account manager because of his race. Although Woods testified during his deposition that defendant Smith once contemplated demoting Woods from an account-manager position to an account-coordinator position, Smith ultimately changed his mind and kept Woods as an account manager. According to Woods, however, Smith did assign the plaintiff "lower profile clients."

"Examples of adverse employment actions include ... reassignment with significantly different responsibilities...." *Smith v. City of Salem, Ohio*, 378 F.3d 566, 575 (6th Cir.2004). However, the reassignment of Woods to other accounts cannot be considered an adverse employment action. According to Woods's own deposition testimony, his salary did not decrease as a result of the reassignment, there was "no change in [his] level of happiness between the two [sets of responsibilities]," and his role in relation to his clients remained "consistent." In short, then, as determined by the district judge, "Woods was subjected to an alteration in his responsibilities and not to a materially adverse change in the terms and conditions of his employment." Summary judgment in favor of the defendants thus was appropriate on Woods's claim of job demotion as well.

### Title VII Claim: Hostile Work Environment

In their final substantive Title VII claim, the plaintiffs assert that conduct and comments made by the defendants served to create a racially hostile work environment at FacilitySource. A plaintiff can establish a Title VII hostile-work-environment claim by offering evidence that "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is suffi-

ciently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (citations and internal quotation marks omitted). Thus:

> To succeed on a claim of a racially hostile work environment, a plaintiff must demonstrate that (1) [he] belonged to a protected group, (2) [he] was subject to unwelcome harassment, (3) the harassment was based on race, (4) the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment, and (5) the defendant knew or should have known about the harassment and failed to act.

*Williams v. CSX Transp. Co.*, 643 F.3d at 511.

On appeal, the defendants do not challenge the plaintiffs' status as members of a protected group, either individually or through association. They also concede that the plaintiffs were subject to unwelcome, racially insensitive comments and that they, the defendants, were aware some of those comments. They contend, however, that many instances of alleged hostility did not involve racial undertones and that, in any event, the harassment claimed by the plaintiffs was, as a matter of law, not "severe or pervasive" enough to alter the conditions of employment.

"[T]he test for a hostile work environment has both objective and subjective components." *Williams v. Gen. Motors Corp.*, 187 F.3d 553, 566 (6th Cir.1999). As the Supreme Court has stated:

> Conduct that is not severe or pervasive enough to create an *objectively* hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview. Likewise, if the victim does not *subjectively* perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation.

*Harris*, 510 U.S. at 21–22, 114 S.Ct. 367 (emphasis added).

> Appropriate factors for the court to consider when determining whether conduct is severe or pervasive enough to constitute a hostile work environment include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.

*Bowman v. Shawnee State Univ.*, 220 F.3d 456, 463 (6th Cir.2000) (citations and internal quotation marks omitted).

Woods readily admitted that he enjoyed his eight-year employment with FacilitySource, especially during the early years of his association with the company. Moreover, Woods recognized that it was defendant Hayden who was responsible for his promotion to the position of account manager in 2009. Nevertheless, the plaintiffs allege that the atmosphere of the workplace changed dramatically with the arrival of Hayden and, later, with Hayden's elevation of defendants Smith and Wagner to senior supervisory positions sometime around 2010.

As discussed in more detail previously, Hayden's tenure with the company coincided with the hiring and the promotion of a number of account managers, none of whom, other than Woods, was African–American. In fact, throughout the time Woods was employed at FacilitySource, he was the only African–American who served in a supervisory position. Woods introduced evidence indicating that the individual defendants made comments and en-

gaged in actions that were intended to isolate Woods from his co-workers and create a less-friendly work environment for him. For example, Woods claimed that "people were instructed to—not to engage or not to assist [him] with" his accounts. Also, Brent Myers, the company's director of human resources, corroborated the fact that Kris Ryan, one of Woods's superiors, came to Myers and complained both that defendant Smith "wanted [Woods] to be fired" and that Wagner directed her "to check on [Woods's] whereabouts while he was on the job."

But other testimony, including Woods's, painted a picture of his co-workers as fond of "kick[ing] back and cut[ting] up," "joking around," and being "outrageous." For instance, Woods once gave Smith a pink cowboy hat because he thought Smith was a "good old country boy," that the gift was "crazy outrageous" but "all in good fun." But, occasionally, what would begin as light-hearted joking in the office could become personally offensive. After Woods labeled a picture of Smith and a co-worker as Milli Vanilli, the lip-synching duo of the 1980s, Smith followed up by referring to Woods as "Dizzy Gillespie," the famed jazz trumpeter, apparently based on Woods's "whole cheeks and the lips and everything, ... physical attributes that are most commonly associated with a certain ethnicity." And, once when Woods "put together a notification process for [a client] for hurricanes or any major weather events," Kris Ryan reported to Woods that defendant Smith had said during a meeting of the senior leadership, "[W]hen it [comes] to the part of the inclement or severe weather topics—Gary [Woods] can dance around and be the dark cloud during the demonstration portion of our piece." Another Facility Source employee whose work station was near Woods's recalled that Smith would "pick on Gary" by "saying some-thing about Gary liking fried chicken and [Kool–Aid]." Woods also complained that he was not allowed to participate in the company's annual golf tournament, despite repeated requests. And he said that Smith sometimes referred to him as "you people," making comments such as "You people are dramatic" and "You people are cheeky." Finally, he pointed to testimony by a co-worker that "[w]hen customers and clients were brought into the office, ... upper management [would] walk them around [the plaintiffs, and] would only introduce clients and customers to [Woods] when the customers or clients asked them to, or when the customer or client was black."

When directed toward or used to describe an African–American employee, especially the sole African–American employee in a management position, such comments and conduct must be considered both inappropriate and racially insensitive. The district court agreed, but the court also found that when taken in context of the workplace atmosphere at Facility-Source, "there is not sufficient evidence from which a jury could reasonably find that the conduct satisfies the severe or pervasive standard," principally because the plaintiffs "have not put forth evidence ... that the alleged offensive conduct had interfered with their ability to perform their work." As the district court noted, "Even with the allegation that defendants walked clients past Woods, plaintiffs have not attempted to explain or show how it interfered with Woods's ability to perform his work for the clients to which he was assigned." Ultimately, Woods was let go from FacilitySource not because his performance was suffering from the effects of a hostile work environment, but because he did not have the qualifications necessary for the position he held and had lied

about his credentials and work history on his employment application.

## CONCLUSION

For the reasons set out above, we conclude that all allegations of error raised by the plaintiffs are without merit, and we AFFIRM the judgment of the district court.